Argued July 9, 1971, reversed and remanded with instructions
March 9, petition for rehearing denied April 18, motion to
modify directions to Circuit Court denied April 18, 1972

LILLIAN D. PEDRO, *Respondent and Cross-Appellant, v.* JANUARY ET AL, *Respondents,*
DELBERT L. PEDRO, *Appellant.*

494 P2d 868

584

*Douglas S. Hess,* Portland, argued the cause for appellant. With him on the briefs were Leland F. Hess, Henry L. Hess, and Hess & Hess, Portland.

*Ernest J. Burrows,* Portland, argued the cause and submitted a brief for respondent and cross-appellant.

*Donald R. Duncan,* Athena, argued the cause and filed a brief for respondents Quality Lumber Mills, Inc., and Oregon-Washington Plywood Company.

*Thomas A. Davis,* Portland, argued the cause for respondents Mary M. January and Mary Ann Robinson. On the brief was William L. Hallmark, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE and HOWELL, Justices.

HOLMAN, J.

This is a d e c l a r a t o r y judgment proceeding brought to determine the status of the parties in relation to the sale and removal of standing timber from real property.

Joseph and Rita Silva Vey were husband and wife and for many years they operated a large sheep ranch in Union, Morrow, and Umatilla counties in the eastern part of the state. The manner in which they held their real property, as between themselves, is not clear. However, this is immaterial in view of the fact that in 1934 they executed parallel wills. Joseph died in 1936; Rita, in 1939. The wills provided that the three daughters of the testators should each have a life estate in an undivided one-third interest in the testators' real property. The wills then provided:

> "Subject to the provisions hereinabove contained in this will, I give and devise to such of the children of my daughter, Mary M. Pedro, as shall survive her, an undivided one-third interest in and to the real property mentioned in paragraph V of this will; to such of the children of my daughter, Rose Monese, as shall survive her, an undivided one-third interest in and to the real property mentioned in paragraph V of this will; and to such of the children of my daughter, Elizabeth Underhill, as shall survive her, an undivided one-third interest in and to the real property mentioned in paragraph V of this will, the descendants of any deceased daughter to take by right of representation, but if any of my said three daughters shall die without issue surviving them, then the property herein devised to such issue shall descend to my other grandchildren by right of representation."

588

· ·In 1941, the Circuit Court of Umatilla County issued a decree of partition, setting aside to Mary M. January, formerly Mary M. Pedro, a daughter of the testators, and to her children, one-third of the property subject to the devise, on which parcel stood the timber in question.[1] The decree of partition divested Rose and Elizabeth, the two other children of the testators, and their children of any interest in the property partitioned to Mary and to her children "save and except such future contingent rights or interests as the children [grandchildren of the testators] * * * may have under the terms, provisions and conditions of the last will and testaments of Joseph Vey, deceased, and Rita Silva Vey, deceased."

In 1964, Mary and her three children, Joseph Pedro, William Pedro, and Mary Ann Robinson, entered into an agreement to sell the timber standing on the property partitioned to them to defendant Quality Lumber Mills, Inc., of which defendant Oregon-Washington Plywood Company is the successor. The proceeds were to be divided one-fourth each to Mary and to her three children. Thereafter, the purchasers logged timber from the property of the reasonable net value of $123,286.92. Before the completion of the contract, Joseph Pedro, the son of Mary and grandson of the testators, died. By the time he died, Joseph had received $21,204.54 from the timber contract, which left a balance of $9,616.77 attributable to the share he would have received, had he lived, for timber logged subsequent to his death. The purchasers placed the remainder of Joseph's share in trust pending a determination of the party entitled to the money. Lillian D.

---

[1] The remaining two-thirds of the property was similarly set aside, one-third each to the testators' two other children and to their children respectively.

Pedro, Joseph's widow, initiated this proceeding as executrix of his estate and as beneficiary of his will to have herself declared the owner of the funds.

The defendant Delbert L. Pedro is the son of Joseph Pedro by a former wife, and he is a grandchild of Mary and a great-grandchild of the testators. Delbert requested the court to adjudicate his rights in and to the timber and the money in question. He claims to be entitled under the Vey wills to interests identical to those of his father. He asked the trial court to restrain the corporate defendants from further cutting, to order them to account for the timber taken, to adjudicate him the owner of the money held in trust, and to give him such other and further relief as would be equitable.

The trial court held that Mary January was possessed of a life estate in the real property, that her children had contingent remainders therein, and that none of them had a right to sell the timber. However, the court dismissed the proceeding. It ruled that the plaintiffs, the estate of Joseph Pedro, and Joseph's widow, Lillian, had no interest in either the proceeds or the timber because Joseph's contingent interest never vested on account of his failure to survive his mother, Mary. The court also held that Delbert, the son of Joseph Pedro, was not entitled under the terms of the will to a contingent interest similar to that of his father. Delbert, Joseph's estate, and Joseph's widow, Lillian, all appealed.

The rights of all of the parties are, in large part, dependent upon the nature of the interest, if any, that Delbert Pedro has by the provisions of his great-grandparents' wills in the property from which the timber was cut. If he has no interest, or if his interest

is so remotely contingent that it does not justify the intervention of the court for his protection, his appeal is not meritorious, and we must turn to Lillian's appeal. But if Delbert has an interest sufficient to justify the protection of equity, Lillian's appeal must fail. A determination of Delbert's interest depends upon a construction of paragraph VIII of the wills which has heretofore been set forth.

■ We must first determine the interest that was given to the children of Mary January, formerly Pedro, by the words of the wills which provide, "I give and devise to such of the children of my daughter, Mary M. Pedro, as shall survive her, an undivided one-third interest in and to all real property * * *." Obviously, the children of Mary who survive her cannot be determined until her death. The devise, being in favor of unascertained persons, is contingent. It did not vest at the death of the testator but will vest on the death of Mary, when her children who survive her can be determined. 4A Thompson, Real Property (1961 Replacement) § 1995, pp. 485-487. The contingency has failed as to Joseph, who did not survive his mother, Mary. The contention made by some of the parties that the devise was a vested one subject to be divested is not well taken.

The parties other than Delbert contend that even if the remainders are contingent and not vested, only the living children of Mary or such of them as survive her will take the property; or, if none survive her, the property will descend to the children of the testators' other daughters. Delbert asserts, to the contrary, that, although he cannot inherit from or through his father in whom no interest vested, he is entitled under the provision of paragraph VIII which states that "* * *

the descendants of any deceased daughter to take by right of representation, * * *" to a remainder identical to that which his father had prior to his death.

■ It is argued by the other parties that Delbert's taking of any future interest in the property as the result of the phrase, "the descendants of any deceased daughter to take by right of representation," is inconsistent with and cannot be reconciled with the devise "to such of the children of my daughter, Mary M. Pedro, as shall survive her." In other words, it is asked, how can Delbert secure an interest by representing his father when his father never had any vested interest? We believe the words were not used to indicate that any interest was to *descend through* Joseph to Delbert. They were used to indicate that the testators intended Delbert to take his father's place as a direct devisee under the will if his father should die before the interests vested by reason of the death of Mary. The words were not intended to be used as words of descent but, rather, as words describing the status of Delbert under the will if his father should die before the interest devised vested.

■■ The parties opposing Delbert also argue that this provision avails Delbert nothing because "deceased daughter" means a daughter who is deceased at the time of the death of the testators and, therefore, Delbert would take under the provision only if Mary predeceased the testators. Such an event did not occur. A standard rule of construction is that the will speaks from the date of the death of the testator unless a contrary intent is manifest. *Heilig v. Daniel,* 203 Or 123, 138, 275 P2d 854, 278 P2d 988 (1955), *revised, Daniel v. Donohue,* 215 Or 373, 333 P2d 1109 (1959). In viewing the wills as a whole, we believe it more

natural for the testators to have intended to speak as of the time their devises would vest, not simply as of the time when they themselves would both be dead. Normally, their daughters would outlive them and, thus, their daughters' deaths, rather than their own, would be the time when the remaindermen would receive the actual benefit of the property. Therefore, we conclude that the testators did not intend to limit the provision for the descendants of a "deceased daughter" to those of a daughter deceased at testators' deaths. Our conclusion is strengthened when we note that no one has explained why it would be reasonable to assume that the testators wanted a great-grandchild to "inherit by right of representation" if his grandmother predeceased the testators, but not if she survived them.

■ It is further contended that because the provision uses the words, "descendants of any deceased daughter," instead of "descendants of any deceased grandchild," the testators contemplated that only their grandchildren would take by representation. It is argued that the clause was intended as an antilapse device to prevent the disinheritance of a grandchild whose parent predeceased the testators. The difficulty with this position is twofold. First, "descendants of any deceased daughter" include *all* descendants and not just the deceased daughter's children. Second, the surviving children of a daughter who predeceased the testators would have taken a fee simple title upon the death of the testators whether or not the quoted provision was present in the will.

Following the above-discussed language, paragraph VIII provides, "* * * if any of my three daughters shall die without *issue* surviving them, then the property herein devised to such *issue* shall descend

to my *other grandchildren* by right of representation" (emphasis supplied). It is argued that this latter clause, despite the use of the word "issue," also demonstrates that by the use of the prior provision, "descendants of any deceased daughter," the testators did not contemplate that those farther down the line of descent than their grandchildren should take. They argue that the use of the word "other" requires that the following word, "grandchildren," designate the remaining group of two or more like groups and, therefore, the prior use of the word "issue" contemplates only the testators' grandchildren.

■ "Issue" normally contemplates lineal descendants. *Howell v. Deady,* 48 F Supp 104, 110 (D Or 1939) ; Black's Law Dictionary 965 (revised 4th ed 1968). Thus, in the present instance, its use would normally include both the testators' grandchildren and great-grandchildren. On the other hand, the term "grandchildren" usually denotes children of the testators' children. These definitions, however, are not invariable for the use of either term. When the two terms are coupled, as they are here, it is just as reasonable to conclude that the use of "grandchildren" contemplated all lineal descendants as it is to conclude that the use of the word "issue" contemplated only grandchildren. In such a situation, the court attempts to determine the intent of the testators from the entire will. In *Rieck v. Richards,* 40 Ohio App 201, 178 NE 276 (1931), a somewhat analogous case, the court said as follows :

"Manifestly there can be no vesting of the corpus until the death of the last child of the testator. Again we revert to the whole will and conclude that it is manifest that the testator wished the shares of his children to descend to the 'issue'

—the lineal descendants—of his children, to his 'grandchildren,' without regard to any number of prefixes, great or great-great.

"As a general rule the word 'grandchildren' is a word of definite meaning, limited to children of children; but where the manifest intention of the testator, as gained from the whole will, requires an extension of the meaning past the strict limitations, a court of chancery is amply warranted, and is, in fact, required, to so extend the meaning." 178 NE at 278.

Taking the will as a whole, we believe the use of "descendants" and "issue" indicates that it was the intention of the testators that no living lineal descendant whose ancestors were dead at the time of vesting should be disinherited.

Such a construction is consistent with what appears to us to be the over-all plan of the testators for disposition of their property. The testators deliberately avoided vesting any interest in Mary's descendants until the expiration of her life estate. By so doing, they were attempting to protect the fee so that it would be available to the descendants of their other children should Mary die leaving no descendants. Otherwise, Mary's descendants could have made a valid and binding disposition out of the blood line even though they died before Mary's life estate expired. It is obvious the testators were attempting, in any event, to have the property available for descent in their blood line upon the death of the life tenants. The testators were clumsily attempting to keep the interests contingent until the death of Mary and, at the same time, permit the descendants of Mary's children to take at Mary's death in the event their parent predeceased Mary.

It is our conclusion that, although inartfully drawn, the will as a whole does not indicate an intention to disinherit a great-grandchild whose parent failed to outlive the life tenant. We believe it was the intention of the testators that Delbert should have a contingent remainder in the event his father, Joseph, predeceased Delbert's grandmother, Mary.

■■ Both the plaintiff Lillian Pedro and defendant Mary January contend that, as a life tenant, Mary January had the right to harvest the timber. Lillian Pedro also contends that Mary January gave Lillian's husband, Joseph, a one-quarter interest in the proceeds of the timber. This Mary January denies. They both rely upon exceptions to the rule that a life tenant commits waste when he severs timber. *See generally* Annotation, "Timber rights of life tenant," 51 ALR2d 1374 (1957). These exceptions are: 1) a life tenant may, under certain circumstances, thin trees to promote growth; and 2) where it has been a custom of the estate to exploit commercially a timber tract and such is the prime use of the tract, a life tenant is privileged to so use it. The trial judge found the facts incompatible with the application of these exceptions, and so do we. The prime use of the land was for grazing, and we do not believe there was any necessity to thin the timber to promote growth.

■ It is clear that Mary January had no right to cut the timber and that Lillian Pedro, as the executrix and beneficiary of the will of Joseph Pedro, has no interest in the proceeds held in trust. Mary January, her children, and her children's spouses sold timber to which Mary would never have been entitled and in which her children had only a contingent interest.

■ The respondents contend that even if they had

no right to remove the timber and Delbert is adjudicated to have a contingent remainder, the court should not award any damages or give him an interest in the trust fund because Delbert has not shown an absolute right to the proceeds. They argue that the occurrence of the contingency upon which his interest vests has not yet occurred. Injunctive relief to prevent damage or waste has been commonly granted to contingent remaindermen, but an assessment of damages for timber already taken has been infrequent. It is clear that if the chances are remote that the contingency vesting the interest will occur, courts will not give relief of any kind to the contingent remainderman. On the other hand, if the contingency is fairly certain, and, therefore, the likelihood of damage to the remainderman is high, courts are more inclined to aid him. However, an assessment of damages is made only if the court impounds the damages to await the outcome of the contingencies. For a general discussion of the problem, *see* Annotation, "Right of owner of contingent or defeasible future interest to maintain action for relief in respect of property," 144 ALR 769, particularly at 807 to 809 (1943).

Section 189 of the Restatement of the Law of Property recognizes that those with contingent interests in real property may secure a determination of damages for an act of waste committed by a life tenant and have the proceeds impounded to await distribution in accordance with the interests of the parties after the contingency upon which their interests depend has been resolved.

The rule we believe to be properly applicable is stated in *Watson v. Wolff-Goldman Realty Co.*, 95 Ark 18, 128 SW 581, Am Ann Cas 1912A 540 (1910).

In that case, the grantees of a life tenant cut and removed timber from the property. The court held that contingent remaindermen, at least some of whose remainders would probably vest, were entitled to a determination of the amount of damages and to an impounding of the proceeds for the benefit of those whose remainders should vest. The court said:

"* * * If a contingent remainderman has right to appeal to a court of equity for the preservation and security of the property to the end that it may be forthcoming at the termination of the life estate with like reason, he should have some remedy for waste already committed. Neither the life tenant nor his grantee have [sic] the right to commit waste, and it necessarily follows that they should not be entitled to, or enjoy, the fruits of their wrongdoing. As we have already seen, the contingent remainderman has no remedy at law in such cases, and it is obvious that, if he cannot obtain relief in equity, he must suffer irreparable injury. Two of the cardinal principles of chancery jurisprudence are that equity will not suffer a wrong to be without a remedy, and equity looks to the substance, rather than the form. "* * * * *

"For these reasons it seems to us that the plaintiffs are entitled to equitable relief. They should not be entitled to it now by way of indemnity, for it cannot be certainly known that they will suffer loss; but we are of the opinion that it is in accord with the principles of equity for the chancellor in cases like this to take an account of the amount of the damage suffered and impound the same and invest the proceeds for the benefit of the one to whom the estate tail would first pass according to the course of the common law by virtue of the deed in question, in which interest the plaintiffs have an expectancy." 128 SW at 583.

See also Dawson v. Tremaine, 93 Mich 320, 53 NW 1044 (1892) (dictum); Williams v. Bolton, 1 Cox 72, 29

Eng Rep 1068 (Ch 1784). *Cf. Louisville Cooperage Co. v. Rudd,* 276 Ky 721, 124 SW2d 1063, 144 ALR 763 (1939).

11. The cases indicate that the decree should direct that the funds be held for those who ultimately are entitled thereto. In the present situation, the funds cannot be held for the benefit of all of those having a contingent interest in the property from whence the timber was taken. The reason is that, as will be subsequently explained, not all persons who have such a contingent interest are parties to this case, and, thus, provision cannot be made for them. Delbert has not purported to bring a class action for those similarly situated. It is not known whether the other contingent remaindermen who are not parties have any desire presently to enforce their rights as does Delbert. It may be that they have consented to the actions of those who authorized the removal of the timber or, if they did not so consent, they may not wish to assert their rights against their relatives. In any event, the fact that the court is in no position to protect all remaindermen is not judged by us to be an adequate reason for not protecting one who has asked the aid of the court in the protection of his rights alone.

■ The respondents also contend that there is no evidence of the depreciation in value of the real property caused by the removal of the timber and, therefore, there is no basis for an award of damages. The only evidence in the record is the net value of the timber which was removed. The net value of the timber removed is sufficient evidence upon which to award damages. The depreciation in value of the property caused by the removal of the timber could be *more* than the net value of the timber but it could not be *less*.

*United States v. Firchau,* 234 Or 241, 248-49, 380 P2d 800 (1963); *O. & C.R.R. Co. v. Jackson,* 21 Or 360, 363-64, 28 P 74 (1891).

The next question is the extent of Delbert's contingent interest in the timber. All interests devised by the testators were undivided interests. The 1941 partition decree, by its terms, did not affect the interests of the contingent remaindermen. Therefore, it is not just the descendants of Mary who have an interest in the timber that was cut from that portion of the property set aside to her by the decree. The descendants of Rose and Elizabeth have undivided contingent interests in the timber as well. Rose and Elizabeth each has one daughter. The contingent future interests in the timber removed and its proceeds are as follows: the daughter of Rose, one-third; the daughter of Elizabeth, one-third; William Pedro, one-ninth; Mary Ann Robinson, one-ninth; and Delbert Pedro, one-ninth. Neither the daughter of Rose nor the daughter of Elizabeth is a party to this proceeding. As previously indicated, it is not known whether they desire to have their rights protected. This proceeding cannot be binding upon them and this court cannot take the interests of the other remaindermen for the protection of Delbert.

We next turn to the questions of the extent of the funds which should be set aside for Delbert's protection and from whence they should come. The total value of the timber taken was $123,296.92. Delbert has a contingent interest in one-ninth of that sum, or $13,698.55. He asserts that he is entitled to have those who received the proceeds of the timber sale pay a sufficient amount into the court to represent his interest in the total amount of timber cut from the

property. He also claims in his brief that the corporations who actually took the timber from the property are responsible for double damages under the provisions of ORS 105.810 and 105.815.

■ In this connection, two problems result from the form of Delbert's answer and cross-complaint. In his pleadings, Delbert does not specifically ask for relief by way of money from his relatives by blood or marriage. However, he does allege the making of the contract by these persons with the corporate defendants, the payment thereunder of sums to such persons by the corporate defendants, and he asks for general equitable relief. We believe his pleadings are sufficient to sustain a judgment against his relatives. Furthermore, he does not plead ORS 105.810 or 105.815 nor ask for the multiple damages for which they provide. However, we have held that it is unnecessary to do so to avail one's self of the benefits of the statutes. *Stott v. J. Al. Lumber Co.*, 95 Or 604, 188 P 414 (1920).

It is asserted by all the parties other than Delbert that the possessor of a contingent future interest is not entitled to the protection of the multiple damage statutes. ORS 105.810 reads as follows:

"Except as provided in ORS 477.090, whenever any person, without lawful authority, wilfully injures or severs *from the land of another* any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub *on the land of another person,* or of the state, county, United States or any public corporation, or on the street or highway in front of any person's house, or in any village, town or city lot, or cultivated grounds, or on the common or public grounds of any village, town or city, or on the street or highway in front thereof, *in an action by such person,*

village, town, city, the United States, state, county, or public corporation, *against the person committing such trespasses* if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed *for the trespass.* In any such action, *upon plaintiff's proof of his ownership of the premises* and the commission by the defendant of any of the acts mentioned in this section, it is prima facie evidence that the acts were committed by the defendant wilfully, intentionally and without plaintiff's consent." (Emphasis added.)

██ ██ The contention is made that, because the statute refers to the intrusion as a trespass, it requires a person who seeks relief thereunder to have a possessory interest because an action of trespass can be brought only by one who is entitled to possession. Delbert, of course, does not have a possessory interest. We do not believe that the use of the word "trespass" contemplates the necessity of a possessory interest in one who seeks to avail himself of the statute. It is true that in order to bring an action of trespass it is necessary for the plaintiff to have the right to possession. However, in a broader sense, the term "trespass" is used as descriptive of the acts of a person who unlawfully injures the property of another. 4 Thompson, Real Property (1961 Replacement) § 1853, p. 396. Black's Law Dictionary 1674 (revised 4th ed 1968). When the corporations took the timber from the property without authority, they committed a trespass. In *Burrill Nat. Bank v. Edminister,* 119 Me 367, 111 A 423, 424 (1920), a mortgagee out of possession was held to be entitled to sue under a statute authorizing an action for damages of "trespass" because of the unauthorized cutting and removal of timber. It is our belief that by the use of the term the legislature was not attempting to describe the form of the action which

could be brought under the statute, but it was describing an act of unauthorized injury to the real property.

It is also contended that even if a possessory interest is not required, the person asserting rights under the statutes must have an existing interest of some sort and not merely a contingent future one. ORS 105.810 refers to "the land of another," and "ownership of the premises." When the term "owner" or "ownership" is used in a statute, the context and purpose of the statute governs what is meant by the use of the terms. This was made plain by the language of this court in the case of *Schram v. Manary,* 123 Or 354, 260 P 214, 262 P 263 (1927):

> "* * * The meaning of the term 'owner,' as used in the Mechanic's Lien Law, is controlled by the context and purpose of the statute. The term, as applied to real property, has no fixed meaning which can be declared to be applicable under all circumstances and under any and every enactment * * *." 123 Or at 363.

It is true that it usually denotes the fee or the person who has the right to possession, but this is not necessarily so.

The purpose of the statute in question is to prevent timber from being taken from land by one who has no authority to do so. If a person could take timber unlawfully and then be compelled to pay only the value of what he cut, the law would afford no protection against any wrongdoer who schemes to force a sale. We believe the statute anticipates that a person who has a real property interest which the law recognizes as entitled to protection is an owner of land. We have already held that Delbert's interest, despite its contingent nature, is entitled to the protection of the court.

We cannot conceive that the legislature intended that the measures it enacted in ORS 105.810 and 105.815 to guard against unlawful timber harvesting would apply only when the right to the land and timber thereon had vested but not when the right was contingent although likely to vest. The persons who are likely to own the land and timber thereon are just as much in need of the protection which the statute affords as are the owners of presently vested interests. To hold that the statutes afford no protection under the present situation would be incongruous.

*Lane v. Wright,* 121 Iowa 376, 96 NW 902, 903 (1903) held that in a statute providing for the redemption of property from a tax sale, the word "owner" included holders of contingent interests. In *Guild v. Prentis,* 83 Vt 212, 74 A 1115, 1116 (1910), it was held that a tenant for a term of years was an "owner" under a statute awarding treble damages for timber removed without the consent of the owner. For cases construing similar statutes to the contrary, *see Gravlee v. Williams,* 112 Ala 539, 20 So 952, 953 (1896) and *Wright v. Bennett,* 4 Ill 258, 259, 3 Scam. 257, 258 (1841). For a discussion of the subject generally and a collection of the cases, *see* "Scope and import of term 'owner' in statutes relating to real property," 2 ALR 778 (1919), *supplemented by* Annotation, 95 ALR 1085 (1935), which generally reflects a broad interpretation of the word "owner" consonant with the court's estimation of the statute under scrutiny.

Normally, another problem would exist in a case of this nature; that is, whether the statute was intended to be applied against other persons having an interest in the property, the extent of which interest is in dispute. We do not have to cross this bridge be-because Delbert does not assert any right under the

statute against his relatives or their spouses. He asks only that they disgorge that portion of the funds which they received which represents his contingent interest in the timber cut from the premises. He does assert his rights under the statute as to the corporate defendants and, as indicated, we believe he is entitled to do so.[2]

Delbert's relatives and their spouses should disgorge the proceeds of the timber which represent Delbert's contingent interest in the same proportion in which they received them. Arithmetically, this amounts to: Mary January, $3,424.71; Mary Ann Robinson, $3,424.62; William Pedro and his wife, Dorothy Pedro, $3,424.61; the estate of Joseph Pedro, and Lillian Pedro, Joseph's wife, $2,356.06; the trust set up by the corporate defendants, $1,068.55, all making a total sum of $13,698.55.

ORS 105.810 provides for treble damages if the invasion of the property was wilful and intentional; ORS 105.815[3] provides for double damages if the invasion was casual, involuntary or under the belief of right. We have held that the award of treble damages under the statute is punitive while that of double dam-

---

[2] There are two other statutes of interest: ORS 105.805, which permits an action for triple damages against a life tenant who commits waste; and ORS 105.825, which allows a person seized of an estate in remainder to maintain an action for any injury to the inheritance. Delbert has not indicated that he is proceeding under these statutes.

[3] ORS 105.815: "If, upon the trial of an action included in ORS 105.810, it appears that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, or that the tree or timber was taken from uninclosed woodland for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall be given for double damages."

ages is not. *Kinzua Lbr. Co. v. Daggett,* 203 Or 585, 281 P2d 221 (1955). We do not have to decide whether a court of equity will enforce the penalty provided by ORS 105.810 because Delbert has conceded that he may recover only double damages in this proceeding.

Delbert will receive once the timber's value from his relatives and their spouses when they disgorge the funds representing his interest which were paid them by the corporate defendants. Therefore, only a like amount need be paid by the corporate defendants to make the double damages provided by the statute. All of the funds came from the corporations and they will have paid double the value of the timber.

The case is reversed and remanded to the trial court with directions to enter a decree directing the persons or entities enumerated below to pay the sums following their names into court. Such sums are to be invested by the court and paid to Delbert Pedro should he survive his grandmother, Mary January, or, if Delbert predeceases Mary, to such of his lineal descendants, if any, by right of representation as should survive her. If Delbert should predecease Mary, leaving no lineal descendants, or if he should predecease her, leaving lineal descendants, none of whom survive Mary, the sums shall be returned by the trial court at the death of Delbert or at the death of his last lineal descendant, as the case may be, to those who are herewith required to pay them: Mary January, $3,424.71; Mary Ann Robinson, $3,424.62; William Pedro and his wife, Dorothy Pedro, $3,424.61; the estate of Joseph Pedro, and Lillian Pedro, as executrix of said estate and as an individual, $2,356.06; the trust fund held by the corporate defendants, $1,068.55; the corporate defendants or either of them, $13,698.55.