Argued and submitted March 11, 1981, affirmed February 2,
appellant - cross-respondent Hess's reconsideration,
respondent - cross-appellant Robinson's reconsideration and
respondent - cross-appellant Pedro's reconsideration denied March 23,
petitions for review denied May 4, 1982 (293 Or 103)

HESS et al,
*Appellants,*
*v.*
SEEGER et al,
*Respondents.*

(No. 24585, CA 16032)

SEEGER,
*Respondent - Cross-Respondent,*
*v.*
HESS et al,
*Appellants - Cross-Respondents,*
PEDRO et al,
*Respondents - Cross-Appellants,*
MOORE et al,
*Respondents,*
*and*
PEDRO,
*Respondent - Cross-Appellant,*
*v.*
HESS et al,
*Appellants - Cross-Respondents.*

(No. 25074)

641 P2d 23

747-a

Wendell Gronso, Burns, argued the cause and filed the briefs for appellants - cross-respondents.

Michael D. Kennedy, Portland, argued the cause for respondent - cross-appellant, Delbert Pedro. With him on the briefs was Kennedy, Bowles, Towsley & Soriano, Portland.

R. L. Marceau, Bend, argued the cause for respondents and respondent - cross-respondent Seeger. With him on the brief was James D. Noteboom, Bend.

Alex Byler, Pendleton, filed the brief for respondent Kinzua Corporation.

Paul D. Schultz, Oregon City, argued the cause for respondents - cross-appellants, William Pedro and Mary Ann Robinson. With him on the brief was Hibbard, Caldwell, Canning, Bowerman & Schultz, Portland.

R. T. Gooding, LaGrande, argued the cause for respondent Rita Clark. On the brief was Phillip A. Mendiguren.

R. J. Seeger, Hermiston, waived appearance for respondent Leland Moore, as personal representative of the estate of Elizabeth Underhill, deceased.

Before Gillette, Presiding Judge, and Richardson, and Roberts, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This appeal concerns the respective interests of the parties in certain land located in eastern Oregon. The land in question was originally owned by Joseph and Rita Silva Vey. All the parties, except the Hesses and Kinzua Corporation, are lineal descendants of the Veys. The Hesses acquired an interest in the Vey estate by virtue of an employment contract in which they agreed to perform legal services for Delbert Pedro, one of the Vey's descendants, in exchange for a percentage of his interest in the Vey estate.[1] Kinzua Corporation's interest is derived from a timber sale contract between it and Bertha Seeger, another descendant of the Veys.

The present case began as a trespass action brought by the Hesses against the Seegers and Kinzua Corporation. The complaint alleged that the Hesses and Bertha Seeger were tenants in common of certain of the property under dispute here and sought damages for timber removed from that land pursuant to a contract between Bertha Seeger and Kinzua. In her answer, Bertha Seeger claimed that the Hesses did not have an interest in the subject land and sought a decree quieting title in herself. Subsequently, Bertha Seeger brought a quiet title action naming as defendants all of the parties claiming an interest in the Vey estate. Delbert Pedro, one of the defendants in the Seeger lawsuit, brought a cross-claim against the Hesses, also defendants in the quiet title action, seeking to have the assignment and deeds he had given to them as a fee for their legal services set aside on the ground that the Hesses did not complete their employment contract with him.

The suits were consolidated for trial. Separate hearings were held to determine the parties' respective interests in the Vey estate, to determine if the Pedro-Hess assignment and deeds should be set aside and to determine the amount, if any, Delbert Pedro owed the Hesses for legal services. The trial court quieted title to the land in dispute

---

[1] Henry Hess, Sr., Leland Hess and Douglas Hess represented Delbert Pedro. Henry Hess, Sr., died before these proceedings were instituted and Henry Hess, Jr., Raymond Hess and Madeline Hess are the personal representatives of his estate.

in Bertha Seeger's favor, ordered the assignment and deeds given by Delbert to the Hesses cancelled and annulled and awarded the Hesses a judgment against Delbert Pedro for $37,500, less money received, for legal services rendered. Because the issue of title was decided adversely to the Hesses, their trespass claim did not have to be decided. The Hesses and Delbert Pedro appeal from all portions of the trial court decree. William Pedro and Mary Ann Robinson, who are also lineal descendants of the Veys, appeal from that portion of the decree quieting title as claimed by Bertha Seeger. We affirm.

## TITLE TO THE VEY LANDS

Examining each matter separately, as did the trial court, we turn first to a determination of the parties' respective interests in the Vey estate. Before setting out the various claims raised, it is necessary to examine the history of these parties and the land in dispute.

### a. The parties and the premises

Joseph and Rita Silva Vey were husband and wife. In 1934 they executed mutual wills. Joseph died in 1936 and Rita died in 1939. Each will provided that the three Vey daughters, Mary Pedro (later January), Rose Monese and Elizabeth Underhill, should each have a life estate in an undivided one-third of the testator's real property. The children of each Vey daughter were given a remainder interest in the Vey property contingent upon their surviving their mother, *i.e.*, the children of Mary January were to receive an undivided one-third interest, the children of Rose Monese were to receive an undivided one-third interest, and the children of Elizabeth Underhill were to receive an undivided one-third interest. In the event that any of the daughters died without surviving issue, the prospective share of that daughter's issue would pass to the issue of the other daughters. The pertinent portion of the will read as follows:

"Subject to the provisions of paragraphs III, IV, V, and VI of this will, I give and devise to each of my three daughters, Mary M. Pedro, Rose Monese, and Elizabeth Underhill, a life estate for the term of her natural life, in and to an undivided one-third of the real property mentioned in paragraph V of this will.

"Subject to the provisions hereinabove contained in this will, I give and devise to such of the children of my daughter, Mary M. Pedro, as shall survive her, an undivided one-third interest in and to the real property mentioned in paragraph V of this will; to such of the children of my daughter, Rose Monese, as shall survive her, an undivided one-third interest in and to the real property mentioned in paragraph V of this will; and to such of the children of my daughter, Elizabeth Underhill, as shall survive her, an undivided one-third interest in and to the real property mentioned in paragraph V of this will, the descendants of any deceased daughter to take by right of representation, but if any of my said three daughters shall die without issue surviving them, then the property herein devised to such issue shall descend to my other grandchildren by right of representation."

The devise to Mary Pedro (January) and her children was conditioned on repayment by them to the testator's estate, or to those entitled to share in the estate, of a sum equal to an amount which had been advanced to Mary by her parents plus the amount of a judgment rendered in the Veys' favor against Mary.[2] Each will read as follows in this respect:

"My daughter, Mary M. Pedro, is at this time indebted to me * * * in a large sum of money now evidenced by judgment of the Circuit Court of Umatilla County, Oregon, and I direct that all bequests and devises herein made to the said Mary M. Pedro and her children, shall be subject to the repayment to the estate or to those entitled to share in my estate under this will, of the full amount of such judgment remaining unpaid at the time of my death, and an additional sum of $6,000.00, and that the said Mary M. Pedro, and her children, shall not be entitled to any benefits under this, my last will and testament, until the amounts in this paragraph mentioned have been repaid by the said Mary M. Pedro or her children from income or property which she would receive under this will, or otherwise, it being my intention that the amount of said judgment, plus the sum of $6,000.00, shall be considered as an advancement to the said Mary M. Pedro to be repaid by her, or from her share of my estate."

---

[2] The judgment arose out of a 1934 suit brought by Mary against the Veys for conversion of a leasehold. The Veys counterclaimed and recovered for unpaid rent and delinquent taxes. *See Pedro v. Vey,* 150 Or 415, 39 P2d 963, 46 P2d 582 (1935).

In 1940, Mary Pedro, by then remarried and known as Mary January, filed a partition suit in Umatilla County Circuit Court seeking a partition of all the Vey lands. All the lineal descendants of the Veys were parties to the 1940 proceeding, with one exception: Delbert Pedro, Mary January's grandchild, was not named as a party to the partition suit, although he was living at the time. The relationship of the Vey descendants is as follows:

JOSEPH VEY AND RITA VEY

Mary Pedro January / Rose Monese / Elizabeth Underhill

William Pedro / Mary Ann Robinson / Joseph Pedro / Bertha Seeger / Rita Hazelwood Clark

Delbert Pedro

The partition decree was entered in 1941. The Vey property was divided into three tracts. Approximately 10,000 acres were set off for Mary January and her children (the January tract); Rose Monese and her children received approximately 21,000 acres (the Monese tract); and Elizabeth Underhill and her children received 20,000 acres (the Underhill tract). In making the division, the debt owed by Mary January to her parents was taken into consideration, thus accounting for the lesser amount of land received by the January line. During the partition proceedings, some of the Vey lands which could not be divided were sold. Three separate funds were created from the sale proceeds. Out of each fund the life tenant was paid a distributive share, and the remainder was then placed in trust for the children of that life tenant.[3]

## b. Pedro v. January

In 1964, Mary January and her three children, Joseph Pedro, William Pedro and Mary Ann Robinson, entered into a contract to sell timber from the January tract to Quality Lumber Mills. The proceeds from the sale were to be divided into four equal portions. In November,

---

[3] After Mary January's death, Mary Ann Robinson, William Pedro and Delbert Pedro petitioned the Umatilla County Circuit Court for receipt of their share of the funds. The record shows that Bertha Seeger also received her share after her mother's death.

1966, before the contract was completed, Joseph Pedro died. Joseph's widow, Lillian Pedro, then brought suit as executrix of his estate and beneficiary under his will to recover the funds due and unpaid to Joseph under the contract. Named as defendants were Mary January, William Pedro, Mary Ann Robinson and Quality Lumber Mills. Quality Lumber Mills filed an interpleader against Delbert Pedro, Joseph's son. Delbert sought the legal services of the Hesses to determine and defend his rights to the timber proceeds. The employment contract, assignment and deeds at issue in the present cases resulted from services rendered by the Hesses in that proceeding, which resulted in the Supreme Court's opinion in *Pedro v. January*, 261 Or 582, 494 P2d 868 (1972).

The issue before the court in *Pedro v. January* was the status of the various parties, *i.e.*, Mary January, William Pedro, Mary Ann Robinson, Lillian Pedro and Delbert Pedro, in relation to the sale and removal of timber from the January tract. Specifically, the court had to determine if Delbert Pedro was an heir under the Vey will and entitled to share in the proceeds of the sale, provided that he survived Mary January. Mary January and her two living children, William Pedro and Mary Ann Robinson, argued that because Joseph Pedro, Delbert's father, did not survive Mary January, Joseph never acquired an interest under the will and so Delbert was not entitled to a share in the Vey properties. Delbert argued, and the court agreed, that because the will also stated that the "descendants of any deceased daughter were to take by right of representation" the will, as a whole, did not indicate an intent to disinherit a great-grandchild whose parent failed to outlive the life tenant. 261 Or at 595. The court held that:

> "* * * the testators intended Delbert to take his father's place as a direct devisee under the will if his father should die before the interests vested by reason of the death of Mary." 261 Or at 591.

Delbert's claim in *Pedro v. January* was that he had a one-third undivided contingent interest in the January tract and, thus, in the timber proceeds. However, considering the interests of the two other Vey daughters, Rose and Elizabeth, and their children, the Supreme Court held that Delbert's interest was only a one-ninth interest.

The court concluded that the 1941 partition decree did not affect the interests of the contingent remaindermen. On that basis and pursuant to the terms of the Vey wills the court found that:

> "The contingent future interests in the timber removed and its proceeds are as follows: the daughter of Rose, one-third; the daughter of Elizabeth, one-third; William Pedro, one-ninth; Mary Ann Robinson, one-ninth; Delbert Pedro, one-ninth." 261 Or at 599.

Neither the daughter of Rose nor the daughter of Elizabeth was a party to the proceeding before the court. The court specifically noted that the proceeding could not be binding on either one of them. 261 Or at 599.

### c. The present proceedings

The hearing in the two cases presently before us commenced on January 9, 1979. By that time the three Vey daughters had died.[4] As noted, Rose and Elizabeth had one child each. The position of these two surviving children was that the 1941 partition decree divided both the life estates and contingent remainder interests. Thus, they argued, Rose's daughter, Bertha Seeger, became the sole owner of the Monese tract upon her mother's death and Elizabeth's daughter, Rita Clark, became the sole owner of the Underhill tract when her mother died. On the other hand, the Hesses and the descendants of Mary January, *i.e.,* William Pedro, Mary Ann Robinson and Delbert Pedro, contended that the partition decree did not divide the interests of the contingent remaindermen. It was their position that, once all three of the Vey sisters had died, their descendants were each entitled to an undivided interest in the entire Vey estate and were not limited to that portion of land awarded to their respective mothers by the partition decree. The significance of these two opposing positions becomes apparent when it is remembered that Mary January was awarded only 10,000 acres of land by the decree in partition, while Rose Monese received 20,000 acres and Elizabeth Underhill received 21,000 acres. The evidence shows that the 1979 value of the Monese tract was $2,838,850 and that

---

[4] Mary January died in December, 1974, Rose Monese died in February, 1976, and Elizabeth Underhill died in December, 1978.

of the Underhill tract was $3,593,500, while the value of the January tract was only $806,350.[5]

The testimony and evidence at the trial focused on the parties' behavior since the 1941 partition decree and their respective views concerning the division of the Vey properties. Rose Monese and her daughter, Bertha Seeger, had entered into a number of leases involving the Monese tract. Those leases, signed in 1951, 1961 and 1971, stated that Rose had a life interest in the tract and that Bertha was the owner in fee. In addition, in 1962, Rose and Bertha had entered into a contract for the sale of timber located on the Monese tract. After her mother's death, Bertha entered into another lease, as well as the timber contract with Kinzua Corporation which precipitated the Hess lawsuit. Rose and Bertha also made various improvements on the land. They remodeled a bungalow on the property, erected a bunkhouse, put up fences and installed wells, telephone lines and electric service. Rose surveyed the property lines of the Monese tract and purchased additional acreage to straighten those lines. Bertha testified that she and her mother believed that, once Rose died, Bertha would be the sole owner of the Monese tract; in all their dealings they treated the land as their own. She testified that she would not have entered into the various contracts and made the improvements she made had she not believed that she was the sole owner of the tract.

Rita Clark testified that she and her mother, Elizabeth Underhill, treated the Underhill tract as if they were the only persons with an interest in it. In 1942 and 1947, they conveyed portions of the tract to the State of Oregon; in each deed they covenanted that they were the owners of the premises. In 1948, and again in 1958, Elizabeth and Rita entered into lumber contracts for the sale of timber located on the Underhill tract.

Both Bertha Seeger and Rita Clark stated that they had read the Supreme Court's opinion. However, Rita stated that she did not understand it. Bertha seemed to have a better understanding of the decision, but nevertheless felt that it did not affect her interest in the Monese tract.

---

[5] These figures include the value of the land and timber located on the land.

As noted, Mary January and her children had entered into a timber contract in 1964. Earlier, in 1963, they had granted an easement to Umatilla Electric Cooperative Association over a portion of the January tract. In 1975, William Pedro, Mary Ann Robinson, Delbert Pedro and the Hesses entered into a farm lease for the January tract. Consistent with the Hesses' opinion, and the Supreme Court's statement in *Pedro v. January, supra,* that all the descendants of the Vey daughters were entitled to an undivided share in the entire estate, the lease included a provision titled "lessors' source and contingency of title explained." This contingency, according to the testimony, referred to the interests Bertha and Rita would have in the January tract when all three sisters died.

It is clear from the testimony that all of the parties knew what each of the other lines was doing from 1941 on. They knew leases had been entered into and that logging was occurring. None of the parties consulted any party outside his or her immediate family about the contracts. No contract, except for the farm lease discussed above, mentioned the possibility of other interests in the particular tract which was the subject of the contract. Until the Hesses sued Bertha Seeger for trespass in connection with the sale and removal of timber on the Monese tract, no claim had been asserted by any line of descendants against any other line.

## d. Trial court decree

The trial court found that, contrary to the Supreme Court's suggestion, the 1941 partition decree divided the interests of the contingent remaindermen as well as the interests of the three Vey sisters. The court, finding the decree somewhat ambiguous, looked beyond the decree to the court file as well as the behavior of the parties after the decree; it found that the evidence indicated "that all of the parties to the partition decree uniformly treated the decree to mean that it partitioned both the life estate and remainder interests." Acknowledging the Supreme Court's decision in *Pedro v. January, supra,* the court noted that the precise issue as to the effect of the partition decree on the remainder interests had not been presented to the court in that case.

There was, however, a limitation on the utility of the partition decree: Delbert Pedro was not a party to the partition suit, and the parties conceded at trial that he was not directly bound by it. The trial court found, however, that Delbert was estopped by his behavior from claiming an interest in the Monese and Underhill tracts. It noted that Delbert had made no attempt to assert any interest in those tracts and had also accepted certain benefits of the partition decree.[6] As assignees and grantees from Delbert, the Hesses could receive only what Delbert had to convey. The trial court went on to find that the Hesses were further estopped by their own conduct since 1972 from claiming an interest in the Monese and Underhill tracts.

### e. The parties' contentions

On appeal, the Hesses and Delbert Pedro contend that the trial court erred in admitting evidence of estoppel, because estoppel was not alleged in Bertha Seeger's complaint. Alternatively, the Hesses and Delbert contend that, assuming estoppel was properly pleaded, the evidence does not support the claim. The Hesses also contend that the extent of Delbert's interests has already been decided by the Supreme Court in *Pedro v. January, supra.* Cross-appellants William Pedro and Mary Ann Robinson contend that the 1941 partition decree, by its terms, did not affect the interests of the contingent remaindermen. They claim that the decree was not ambiguous and that the trial court erred in admitting into evidence and relying on the trial court file from the partition case and the parties' behavior and interpretation of the partition decree.

### f. The 1941 partition decree

■ We turn now to an examination of the partition decree. In 1940, when Mary January brought the partition suit, the law in Oregon provided that a co-tenant who had a fee simple, a life estate, an estate for years or a vested remainder or reversion in any real property could maintain a suit for partition. OCLA § 9-601. A contingent remainderman could not maintain a partition suit but could be named as a defendant in a partition suit brought by those parties identified above. OCLA § 9-602; *see Savage v. Savage,* 19

---

[6] *See* n 3, at 6, *supra.*

Or 112 (1890) (dealing with a similar statute). The law provided further that all parties to the partition suit, even those with contingent interests only, would be bound by the court's decree.[7] OCLA § 9-610 provided, in pertinent part, that:

"The court may confirm or set aside the report in whole or in part, and if necessary appoint new referees. Upon the report being confirmed, a decree shall be given that such partition be effectual forever, which decree shall be binding and conclusive:

"(1) On all parties named therein, and their legal representatives, who have at the time any interest in the property divided, or any part thereof, as owners in fee, or as tenants for life or for years, or as entitled to the reversion, remainder, or inheritance of such property or any part thereof after the termination of a particular estate therein, or who by any contingency may be entitled to a beneficial interest in the property, or who have an interest in any undivided share thereof as tenants for years or for life;

"* * * * *."

*Ukase Inv. Co. v. Smith,* 92 Or 337, 181 P 7 (1919); *see also, French v. Goin,* 75 Or 255, 146 P 91 (1915). It is clear that the contingent remaindermen in this case could properly have been named as defendants in a partition suit brought by a life tenant and could have been bound by the court's decree in that suit. The question is whether the 1941 decree was intended to bind them.

The 1941 partition decree provided, in one pertinent part:

"It is, therefore, ORDERED, ADJUDGED and DECREED that the Court has partitioned and does hereby partition and set off to the plaintiff Mary M. January for her life *and to her children* the following described real property * * *.

[After describing the real property, the partition decree continues as follows:]

"It is further ORDERED and DECREED that Mary M. January and her children have no right, title, estate or

---

[7] Thompson notes that at common law estates in remainder or reversion could not be divided by compulsory partition but that in some states partition may be had against all persons having an interest in the estate, whether a present or future conditional interest. 4 *Thompson on Real Property* (1979 Replacement) §§ 1823-1824.

interest in or to the real property set off and partitioned to the other parties to this decree *save and except such further contingent rights or interests as the children of Mary M. January may have under the terms, provisions and conditions of the last will and testament of Joe Vey, deceased and Rita Silva Vey, deceased."* (Emphasis supplied.)

The same language was used in partitioning land for Rose Monese and Elizabeth Underhill and their children.

We think the decree is clear. The court partitioned *both* the life estate and the named contingent remainder interests. Both the life tenant and her children were divested of right to and title in the property awarded to the other life tenants and their children. Some of the language emphasized above does except further contingent interests that the children of the life tenant "may have" under the Vey wills. However, when read with the wills, as required by the terms of the decree, it is clear that "further interests" refers to the right of the children of one life tenant to share in the land allocated to any life tenant who dies without issue. Because the partition decree was entered into while the three life tenants were still alive, it was not known at the time whether any of them would die without surviving issue; therefore, this contingency had to be provided for. The provision does not mean, as Mary January's descendants claim, that the circuit court intended to except the contingent rights of the Vey grandchildren.[8]

It is true that the Supreme Court in *Pedro v. January, supra,* 261 Or at 599, specifically stated that the 1941 partition decree did *not* affect the interests of the contingent remaindermen. However, in the context in which that observation was made, it is clear that the court could have been referring only to the contingent remaindermen who would take in the remotely possible event that Mary January died without lineal descendants surviving her.

### g. Delbert's Interest

William Pedro, Mary Ann Robinson, Bertha Seeger and Rita Clark were parties to the 1941 partition suit; by

---

[8] Assuming that the partition decree is ambigious and that we may look behind the judgment to the entire court file, *see Bennett v. Bennett,* 208 Or 524, 529, 302 P2d 1019 (1956), we find that the record supports our interpretation of the partition decree.

the terms of the decree they are bound by its division of the Vey estate. Delbert Pedro was not a party to the 1941 suit; his interest must be considered separately. We conclude that Delbert, too, is bound by the 1941 decree.

Because Delbert was not a party to the 1941 suit, he is not *automatically* bound, as are the other contingent remaindermen. He would be bound if he were claiming from someone who was a party to the suit, but we conclude that he does not claim *from* anyone: he does not claim or take from or through Mary, because she only had a life estate; he does not claim or take from Joseph, his father, because Joseph died before Mary and his interest in the land never vested.

We think, however, that Delbert is bound because, at the time of the 1941 decree, he was *in privity with* his father. In 1941, the relationship between Joseph, the father, and Delbert, the son, was such that, as a matter of fairness, Delbert should be treated as being bound by a decree affecting his father's interests, which were the exact equivalent of his own. *See Wolff v. Dupuis,* 233 Or 317, 321, 378 P2d 707 (1962); *see also,* Simes, *Future Interests* (Hornbook Series), § 49. This appears to have been precisely the position Delbert himself took in *Pedro v. January, supra,* where the Supreme Court noted: "* * * [Delbert] claims to be entitled under the Vey wills to interests identical to those of his father. * * * " 261 Or at 589. The court reasoned that the words of the Vey wills

"* * * were not used to indicate that any interest was to *descend through* Joseph to Delbert. They were intended to indicate that the testators intended Delbert to take his father's place * * * ." 261 Or at 591. (Emphasis in original.)

We hold that the interest Delbert had was the same as that of Joseph, which interest had been limited in the 1941 decree. It follows that, as matters have now developed, Delbert has no interest in the Monese or Underhill tracts because, Joseph was given none by the partition decree and neither Rose Monese nor Elizabeth Underhill died without surviving lineal descendants.

There are other reasons as well for restricting Delbert's interest. The trial court found that Bertha Seeger

both alleged and proved estoppel. A party asserting estoppel must plead facts giving rise to the claim of estoppel which demonstrate why the opposing party should not be permitted to avail itself of a particular position. This includes the behavior relied upon, reasonable reliance on the pleading party's part and a resulting change in position. *Davidson v. Wyatt*, 289 Or 47, 57, 609 P2d 1298 (1980); *Consolidated Freightways v. Eddy*, 266 Or 385, 396-397, 513 P2d 1161 (1973); *Holmes v. Morgan*, 10 Or App 242, 248, 498 P2d 830, *rev den* (1972).

In this case, Bertha contended in her complaint that the effect of the partition decree was to limit the interest of all the contingent remaindermen to that portion of the land parceled to their respective mothers. She then alleged that subsequent to the issuance of the partition decree plaintiff and defendants' actions in conformed to this interpretation of the decree. She states further that, after Mary January's death, her heirs received all the rents and profits from the January tract and that before her death they participated in the sale of timber from the January tract. In her prayer for relief, Bertha requested a declaration that the effect of the partition decree was to bind all the contingent remaindermen.

Although the complaint is somewhat lacking in detail, we think that it is sufficient to raise a claim of estoppel. It clearly sets forth the behavior of the January descendants that indicates why Delbert should be estopped to claim more of the estate than was partitioned to the January line. It alleges that all of the parties acted in conformance with the decree. One can fairly infer from that statement that Bertha and her mother relied, not only on the decree, but on the parties' behavior with respect to the partition decree. Each line of descendants treated its parcel as its own and made no objection to any other line doing likewise. Relying on the defendants' behavior or conformance to the partition decree, Bertha and her mother changed their position in that they treated the parcel alloted to them as their own and ignored the other parcels.

To constitute an equitable estoppel or estoppel by conduct, there must be (1) a false representation, (2) made with knowledge of the facts, and (3) the other party must

have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it. *Bash v. Fir Grove Cemeteries, Co.,* 282 Or 677, 687, 581 P2d 75 (1978). Estoppel protects only those who materially change their position in reliance on another's acts or representations. There must be a right to rely, and the reliance must be reasonable. *Bash v. Fir Grove Cemeteries, Co., supra,* 282 Or at 677; *Community Bank v. Jones,* 278 Or 647, 673, 566 P2d 470 (1977). To establish an estoppel by failure to disclose a claim of title to real property, it must be shown that the party claiming estoppel had no knowledge, actual or constructive, of the real condition of the title to the property in question. *Shaw v. Northwest Truck Repair,* 273 Or 452, 457, 541 P2d 1277 (1975); *Willis v. Stager,* 257 Or 608, 619-620, 481 P2d 78 (1971).

Although the elements set out above would seem to require proof of actual intent, and perhaps even a fraudulent representation, the cases do not require so much. In *Schmeck v. Bogatay,* 259 Or 188, 197, 485 P2d 1095 (1971), the court stated that estoppel by conduct may not require proof of intent. Thompson states:

"An estoppel may arise although there was no designed fraud on the part of the person sought to be estopped. The principle is applied as a bar to preclude a person from denying the truth of a fact which has in contemplation of law become settled by acts and proceedings of judicial or legislative officers, or by acts of the party himself, either by conventional writing or by representations, express or implied in pais. The doctrine does not require a showing of some actual turpitude on the part of one against whom the estoppel is asserted, but rather all that is meant by the assertion that an estoppel must possess an element of fraud is that the case must be one in which the circumstances and conduct would render it a fraud for the party to deny what he had previously induced or suffered another to believe and take action upon. The intended deception is a matter of inference to be drawn from facts relied upon to establish an estoppel.

"* * * * *

"But while actual fraud will give rise to an estoppel in almost every case, the decided weight of authority is to the effect that it is not necessary that malevolent or wrongful motives be shown in making the representations. To create

the estoppel it is not necessary to show a fraudulent intent. It is not necessary to the existence of an equitable estoppel that there should exist a design to deceive or defraud, but it is sufficient if the person against whom estoppel is asserted by his silence or representation has created a belief of the existence of a state of facts which it would be unconscionable to deny. One may be estopped by conduct, words, or even by a guilty silence when honesty demands that he speak the truth of the matter for which the situation calls. It is held that the proof of fraud in its strict sense is not essential." 5 *Thompson on Real Property* (1979 Replacement) § 2524, 536, 541.

■ ■ Estoppel may also apply where an individual accepts the benefits of a particular transaction or state of affairs. To establish an estoppel by acceptance of benefits,

"* * * it is essential that the party against whom estoppel is invoked should have acted with knowledge of his rights, and that the party claiming estoppel was without knowledge or means of knowledge of the facts on which he bases his claim of estoppel, that he was influenced by and relied on the conduct of the person sought to be estopped, and that he changed his position in reliance thereon to his injury." 5 *Thompson on Real Property* (1979 Replacement) § 2525, 552.

Given these principles, we find that Delbert is estopped to claim an interest in the entire Vey estate. Both the other contingent lines have changed position without objection. More importantly, Delbert, both by the position he took in *Pedro v. January* and by the fact that he accepted (indeed, demanded) "his" share of the benefits from the partition suit, has indicated that his claim is measured by his *father's* contingent interest and not some other, greater interest.[9]

## ASSIGNMENT AND DEEDS

As noted, the Hesses represented Delbert Pedro in the case of *Pedro v. January, supra.* Delbert and the Hesses entered into an employment contract whereby Delbert would assign a percentage of his interest in the Vey properties, both the land and the proceeds from the land, in

---

[9] Bertha Seeger contends further that the trial court's decision may be upheld on the theory of parol partition. We need not consider this further ground, inasmuch as we find Delbert to be bound by the partition decree on two other theories.

return for legal services. Delbert was successful in that case and, pursuant to the employment contract, he executed an assignment and four deeds granting the Hesses one-half of his undivided interest in the Vey estate.[10] When Bertha Seeger initiated this action against all those with an interest in the Vey properties, Delbert brought a cross-claim against the Hesses seeking to set aside the assignment and deeds he had executed. The circuit court found that the Hesses did not fulfill their contract and, therefore, were not entitled to 50 percent of Delbert's interest in the Vey lands.

The contract between the Hesses and Delbert provides, in pertinent part:

"WHEREAS, it is the desire of the undersigned, Delbert Pedro to employ Henry L. Hess and the firm of Hess and Hess, consisting of Leland F. Hess and Douglas S. Hess, as his attorneys to secure his rights under this proceeding herein mentioned, pending in Multnomah County, Oregon, as well as to establish any other rights which Delbert Pedro may have in and to the real properties hereinabove described, as well as the other real properties devised under the Wills of Joseph Vey and Rita Silva Vey, and further legal rights he may have for timber removed from any or all of said real properties so devised, whether to be litigated in Multnomah County or otherwise, and

"* * * * *

"WHEREAS, it is also understood by Delbert Pedro that some of his rights, particularly but not limited to his interest in the fee simple title of the hereinabove described property may not be determinable in the Multnomah County proceeding.

"NOW, THEREFORE, it is hereby agreed between the parties that the undersigned Delbert Pedro employs the above named Henry L. Hess and the firm of Hess and Hess as his attorneys for the complete determination of his rights in and to any and all of the real property devised under the terms of the Wills of Joseph Vey and Rita Silva Vey and for the recovery of any rights and sums due him for sale of timber from all or any portion of said properties as in their discretion they deem necessary, whether determinable in the Multnomah County proceeding now pending or otherwise."

---

[10] Four deeds were executed by Delbert Pedro. Two dealt with his interest in the January tract, one, his interest in the Monese tract and one, his interest in the Underhill tract.

■     The contract is clear. The Hesses were to represent Delbert Pedro in the lawsuit then pending in Multnomah County, *Pedro v. January,* "as well as to establish any other rights Delbert * * * may have in and to any of the * * * properties," or proceeds earned from those properties, devised under the Vey wills. They were to secure a "complete determination" of his rights to the Vey properties. The Hesses agree with this interpretation. They contend, however, that *Pedro v. January* did "completely and once and for all determine Delbert's interests in the Vey lands."[11]

■     We disagree. The 1972 case determined that Delbert had an interest under the Vey wills. It also purported to determine the extent of his interest. However, it only secured his rights in the January tract and the proceeds from the sale of timber located on that tract. Because the descendants of Rose Monese and Elizabeth Underhill were not parties to the suit, the decision was not binding upon them, and Delbert's rights with respect to to the Monese and Underhill tracts could not be established as a result of it. Some further action, involving the Monese and Underhill families, was needed to establish the precise extent of Delbert's rights. In fact, this case is that action. The employment contract itself recognized that other action, beyond the then pending lawsuit of *Pedro v. January, supra,* might have to be taken before a "complete determination" of Delbert's rights could be attained.

---

[11] Initially, Delbert contends that, because the Hesses requested and obtained a judgment for *quantum meruit* in this case, they cannot now appeal from that portion of the trial court's decree setting aside the assignment and deeds. Delbert relies on the principle of election of remedies, which provides that a plaintiff cannot both affirm and disaffirm the same contract. *See McAllister v. Charter First Mortgage Inc.,* 279 Or 279, 287, 567 P2d 539 (1977). That principle, which is designed to prevent double recovery, is not applicable to the situation before us. The Hesses are not seeking to recover both under the employment contract and in *quantum meruit.* They are simply appealing the trial court's decision. If we were to reverse the decree setting aside the assignment and deeds, that portion of the decree allowing recovery in *quantum meruit* would also be reversed.

Neither is this a case, as Delbert seems to claim, where an appeal is foreclosed because the plaintiff sought two alternative remedies, the trial court granted one of the alternatives and the plaintiff then accepted the benefits of the decree entered in its favor. *See Bell Rose Sanitarium v. Metz,* 246 Or 475, 425 P2d 168 (1967). Delbert, not the Hesses, sought to have the deeds set aside. After setting aside the deeds, the trial court, believing that the Hesses were entitled to compensation, awarded them a money judgment against Delbert. Neither party now claims that the trial court's action was improper. There is also no claim or evidence that the Hesses have received any money from Delbert pursuant to the decree.

We agree with the trial court's conclusion. The Hesses did not fulfill their contractual obligation to Delbert. The assignment and deeds were properly set aside.[12]

## RECOVERY FOR LEGAL SERVICES

The final matter we must consider is whether the amount awarded to the Hesses for legal services rendered on Delbert's behalf was proper. As noted, after setting aside the Pedro-Hess deeds, the trial court found that the Hesses were entitled to reasonable compensation for their services and held a separate hearing to determine the appropriate amount. It awarded the Hesses $37,500, less any sums already paid by Delbert.

The Hesses claim that the award is too low. Delbert Pedro cross-appeals, claiming that the Hesses are entitled to only $15,160, the sum they have already received from him. Delbert contends that their recovery should be limited, because they withdrew from representation without just cause and without his consent, because his damage from being estopped to claim an interest in the Monese and Underhill tracts should be considered and because $15,160 is an adequate fee for the services the Hesses rendered.

Initially, we must determine our scope of review. Delbert's claim against the Hesses was for rescission of the assignment and deeds executed by him. The Hesses did not seek recovery in *quantum meruit* until after the trial court determined that the deeds were invalid, but that the Hesses were nevertheless entitled to some compensation. A suit to set aside a deed is a suit in equity. *Dillin v. Alexander,* 281 Or 679, 576 P2d 1248 (1978); *Bartlett v. Whidden,* 252 Or 501, 449 P2d 850 (1969). Because Delbert's cross-claim is in equity, we review the entire matter *de novo,* even though we are now concerned with the recovery of a money judgment. *See Nedry v. Morgan,* 284 Or 65, 584 P2d 1381 (1978); *Derenco v. Benj. Franklin Fed Sav & Loan,* 281 Or 533, 577 P2d 477 (1978), *cert denied* 439 US 1051 (1978); *Christen v. Malco,* 279 Or 649, 569 P2d 602 (1977).

Despite the trial court's finding that the Hesses had not completed their contract with Delbert, the Hesses

---

[12] Delbert also claims that the deeds were executed under undue influence exercised by the Hesses. We find no evidence of undue influence in the record.

nevertheless presented expert testimony to the effect that they were entitled to one-half of whatever Delbert had received as a result of *Pedro v. January, supra.* One of the attorneys testifying on the Hesses' behalf felt that the costs of the present suit should be subtracted from that sum. The attorneys testifying for Delbert felt that reasonable compensation for the Hesses would be approximately $15,000.

Much of the expert testimony related to whether the Hesses acted reasonably in not joining the descendants of Rose Monese and Elizabeth Underhill in the suit of *Pedro v. January, supra,* or in not taking action against them at a later time. The experts were split on their assessment of the Hesses' action or lack thereof. They all agreed, however, that substantial services were performed by the Hesses on Delbert's behalf. At the time Delbert went to the Hesses, he was in default. Before the Hesses could confront the substantive issues, the default judgment had to be set aside. Delbert had been to other attorneys but found no one who would take his case. The experts agreed that the only way Delbert could have secured representation was on a contingent fee basis.

There is no question that the case presented both difficult and novel questions of law. The Hesses enjoyed reputations as competent attorneys, and the attorneys testifying agreed that their work was good. Douglas Hess, one of the attorneys who represented Delbert, estimated that at least 1000 hours were spent on the case and that in all likelihood the time spent was close to 2000 hours. The results obtained on Delbert's behalf were significant: the default judgment was set aside and, on appeal, the Hesses established that Delbert did, in fact, have an interest in the Vey properties. The worth of the January tract is $806,350; Delbert's share is worth approximately $268,780. Although the Hesses did not keep time records, it is apparent that considerable time was spent on the case.

In determining the appropriate amount of attorney's fees, we consider several factors: time devoted to the case; difficulty and complexity of the issues involved; nature of the proceedings; value of the interests involved; the result secured; skill and eminence of opposing counsel; and the skill and standing of the Hesses. *See Newbern v.*

*Gas-Ice Corporation,* 263 Or 250, 258, 501 P2d 1294 (1972); *Muncy v. SAIF,* 19 Or App 783, 787, 529 P2d 407 (1974).

■  Applying these factors to this case, we conclude that $37,500 is an appropriate award. Initially, we reject the sum of $15,160 as too low. The Hesses performed substantial services on Delbert's behalf, and the results obtained by them were significant. We also reject the notion that they are entitled to half the value of Delbert's recovery because, as we have already determined, the Hesses did not complete their employment contract. Given the lack of time records or other evidence, we see no basis on which we can say the trial court was mistaken in its award of $37,500. It is affirmed.

Turning to Delbert's other claims, we find that they do not affect the amount awarded. Delbert claims that the Hesses should not receive more than $15,160 because they withdrew from his case without just cause. *See* 7 Am Jur 2d, Attorneys At Law, § 262. The Hesses withdrew from representation of Delbert after they acquired an interest in the Vey properties. Delbert admits that that created a possible conflict of interest which would be good cause for declining to represent him further. However, he claims that the question should be whether the Hesses were justified in taking the deeds which created the conflict of interest. We disagree. The narrow issue before us now is the amount the Hesses should be awarded as attorney fees for the valuable services which they undeniably rendered.

■  Delbert's final contention is that the trial court erred in not subtracting his "damage" from the award in quantum meruit. Delbert does not seek recovery of the amount of his damage but only a limitation of the award to the Hesses. Recovery in *quantum meruit* is based on the value of the benefit rendered. *Hershiser v. U. S. Fidelity & Guaranty,* 276 Or 815, 821, 556 P2d 663 (1976). While the Hesses did not complete their employment contract, they did perform substantial services for Delbert. Without their efforts, he would have lost much, if not all, of his interest in the Vey properties forever. The amount awarded takes this into account.

The trial court's decree is affirmed.