IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROY A. AMES and RUBYE M. AMES, husband and wife | ) ) ) | No. 31661-1-III (consolidated with |
| Respondents, | ) ) | 31825-7-III) |
| | ) ) | |
| vs. | ) ) | |
| WESLEY B. AMES; AMES | ) | PUBLISHED OPINION |
| DEVELOPMENT CORPORATION, an | ) | |
| Oregon Corporation; and STANLEY R. | ) | |
| AMES, individually; and MERITA | ) | |
| DYSART, individually, | ) | |
| | ) | |
| Appellants. | ) | |

FEARING, J. — In 1997, Roy and Rubye Ames sold, without a written agreement, their property, consisting of farmland and timber, to their two oldest sons, Stanley and Wesley Ames. The parents retained a life estate. After another son moved to the property, the two oldest sons and their parents grew estranged. Roy and Rubye filed this action, asking the court to exercise its authority in equity to order title in the property returned to them. In the alternative, the parents sought recognition of their life estate and an unlimited right to control the property during their lives. The trial court awarded Roy and Rubye a life estate in the property, including a limited right to harvest timber.

Stanley and Wesley Ames appeal the timber award. We affirm the trial court.

## FACTS

The Ames brothers do not challenge the trial court's findings of fact on appeal. We extensively rely on the findings in our recitation of facts.

Roy Ames and Rubye Ames are respectively 92 and 84 years old. They have been married for 67 years. The couple has five children: Wesley Ames, Stanley Ames, Merita Dysart, Randy Ames, and Arleta Parr.

The parents love their children, but in recent years and as a result of this lawsuit, have become estranged from the three older children, Wesley, Stanley, and Merita, who live in other states. The two younger children are presently close to Roy and Rubye. Despite their age, Roy and Rubye are fully competent and display a clear understanding of their financial affairs.

In 1966, Roy and Rubye Ames acquired a quarter section of farm and timber land in Stevens County. They have farmed the property and made improvements to the land since 1966, and have lived there continuously since 1976. They have managed the timber with occasional small scale logging. Their present income consists of a modest Social Security payment, occasional logging proceeds, limited farm income, and payments from Wesley and Stanley for the purchase of the property.

In 1997, Roy and Rubye needed income to supplement their farm income. They considered a reverse mortgage, but wanted the farm kept within the family. The youngest

2

son, Randy Ames, and his family had moved to Lithuania. The parents conferred with their other children, and Wesley and Stanley were willing and financially able to help their parents.

After careful discussions, Roy and Rubye Ames reached an agreement with sons Wesley and Stanley. Under the agreement, Wesley and Stanley would pay $216,000 over 30 years, with no interest, payable at $600 per month. If both Roy and Rubye died before full payment, the remaining payments would go to the other three children. Wesley and Stanley would then receive title to the real property, improvements, timber, and farm equipment. Roy and Rubye reserved a life estate, defined as including full possession, management, and control of the real property, improvements, timber, and farm equipment. The parties did not reduce the agreement to writing, but the agreement was restated in two e-mails from Stanley to Randy, on March 27 and March 29, 2009. Roy and Rubye Ames retained title to the property in their names.

At trial, Roy Ames testified he always "intended to control the farm, or have somebody else do it" during his lifetime. He declared: "I'm on the farm, all aspects of the farm, until I die." Clerks Papers (CP) at 416. Both Wesley and Stanley Ames anticipate living on the Stevens County property upon their respective retirements. Each will have limited income at retirement.

Since the 1997 agreement, Roy and Rubye Ames have continued in possession, management, and control of the real property along with the farm operation and the

3

timber. On January 11, 2006, Roy and Rubye deeded the land to Wesley Ames and Ames Development Corporation "in consideration of love and affection." CP at 886. The deed reserved no life estate. The accompanying real estate excise tax affidavit declared that the transfer was a gift without consideration. All parties understood the 2006 conveyance was intended to insulate the property from creditors and, in particular, from the State for any future medical care.

Beginning in 2009, Roy and Rubye Ames physically struggled to maintain the farm on their own. Roy and Rubye invited son Randy and his family, who had returned from Lithuania, to live on the farm so that Randy could help. The Ames family discussed building a house on the farm for Randy and his family. Wesley and Stanley, on the one hand, and Randy, on the other hand, negotiated a farm lease for Randy.

On September 6, 2010, Stanley, as President of Ames Development Corporation, entered both a rental agreement and a cash farm lease with Randy and his wife, Darlene. The farm lease allowed the "owners," Stanley and Ames Development Corporation, to "enter the property at any time for any purpose" and it partially limited Roy and Rubye's management of the timberland. CP at 417. The rental agreement and farm lease conflicted with Roy and Rubye Ames' life estate.

In recent years, Wesley and Stanley Ames have interfered with Roy and Rubye's right, pursuant to their life estate, to full control and management of the farm. Randy has participated in the interference but with different motives and by different means. Randy

4

Ames has sought to gain control and ownership of the property. Randy constructed an addition to Roy and Rubye's existing home, rather than building a new home. He manipulated his elderly parents and isolated them from their family and friends. On one occasion, Randy spirited Roy away for one week, took Rubye's cell phone, and prevented visits to his parents by neighbors, friends, and fellow church members.

In January 2011, Ames Development Corporation and Wesley Ames entered a housing and farming agreement with Roy and Rubye Ames. The agreement sought to "establish a relationship" between the parties in light of Randy Ames being a tenant on the farm. CP at 417. It granted Roy and Rubye rights they already held under the oral life estate, such as the right to possession and the right to lease the premises. The agreement limited some of their rights, including the right to come and go, the right to manage the timber, and the right to determine farming activities. Finally, it granted Stanley, Ames Development Corporation, and Wesley rights they did not have under the oral life estate, such as the right to enter and remain on the land at any time, the right to construct and remove buildings, and the right to confer with Roy and Rubye about all farm activities. Stanley, Ames Development Corporation, and Wesley could cancel the agreement at any time.

In July 2011, Stanley and Wesley Ames terminated the farm lease with Randy. Because of a lack of trust in Randy, Stanley and Wesley removed equipment from the farm to prevent Randy from farming. The two older brothers later returned the

equipment.

## PROCEDURE

On July 15, 2011, Roy Ames filed suit against his three oldest children, Wesley Ames, Stanley Ames, and Merita Dysart. Roy requested either: (1) title in the property with an equitable lien for Wesley and Stanley for payments made toward the purchase of the real property and to be paid after both he and Rubye die, or (2) a life estate in the property with "total and absolute control of the property." CP at 14. Rubye Ames joined her husband as a plaintiff on October 25, 2011.

Trial proceeded on September 4, 5, 6, 7, 11, and 12, 2012. On the first day, Roy and Rubye Ames moved to dismiss their alternative claim for a life estate. The court granted that motion, but allowed Stanley and Wesley Ames to request, as a counterclaim, the same relief of a life estate for their parents.

At trial, Roy and Rubye Ames testified to why a life estate was no longer feasible, how much timber they harvested in the past, and their expectations for harvests in the future. Roy Ames testified to logging about $2,000 in timber each year since the 1997 agreement. Roy and Rubye both testified that they expected to enjoy full use and control of the property until they died, which included "timber and everything else." Report of Proceedings (Sept. 4, 2012) at 56. Rubye Ames testified that she and her older children needed "a clean break," because they could no longer cooperate. RP (Sept. 4, 2012) at 59.

6

During trial, Wesley and Stanley Ames voiced concern that Randy would clear cut the timber. Wesley testified: "We strongly believe that the timber will be harvested very heavily in order to obtain money, and we further expect that a substantial amount of that money would go under the control and use by Randy." RP (Sept. 11, 2012) at 726. Stanley testified that Randy will likely enjoy the benefit of any logging, stating: "Well, he will rationalize it in terms of Mom and Dad receiving benefit, but actually, just like all of our farm payments - it - there it goes to Randy and Darleen almost entirely." RP (Sept. 11, 2012) at 856.

To show that Roy competently managed the timber, Roy and Rubye offered a report from forester Robert Broden, entitled "Managing Your Woodlands: A template for your plans for the future," referred to as the Broden report. CP at 1286. Stanley and Wesley objected to admission of the report as an exhibit on the ground of hearsay. The court admitted the report, ostensibly under the hearsay exception for business records. Rubye testified that she and Roy had no intention of clear-cutting the forest, and planned to follow the report's recommendations to preserve the forest resource.

In the Broden report, Robert Broden recommended thinning of the forest to promote overall growth. In relevant portion, Broden wrote:

> The Lodgepole Pine on the property in particular has reached an age and condition where growth has slowed and increased natural mortality will become an annual event. In addition, there are areas of crown closure of the Douglas Fir and Grand Fir where some commercial thinning of the trees will promote or at least maintain healthier growth conditions for the

7

remaining timber.

. . . .

A salvage operation which would select the obvious mature trees susceptible to disease or damage for removal as well as a commercial thinning to space the mature trees to about 24 feet by 24 feet should promote healthy and disease resistant trees for future growth while maintaining wildlife habitat for deer, elk, bear and other small mammals. Scattered cavity nesting sites and raptor nests were noted in snags and timber on the property as well as on adjacent ownerships to the west and south. A reduction of the wildfire potential is also sought by removing dead and down fuels.

CP at 393.

Robert Broden further wrote:

Removal of the old Lodgepole Pine around the perimeter of the fields and a commercial thinning operation in the thicker canopied areas is proposed to promote understory foreage vegetation while still maintaining a substantial and healthy timber volume on the property.

CP at 400. Under the heading "Management of Forest Resources," Broden advised,

**Protection from Pests**
Observed insect pests on the property noted during the timber cruise included moderate bark beetle activity in the Lodgepole Pine and Fir Engraver beetle in the Grand Fir. Pathogens noted were minor problems with Douglas Fir Mistletoe in certain areas and a moderate amount of Mistletoe in the Western Larch. Harvest operations should work at eradicating these problems in the trees selected for removal.

CP at 401.

Robert Broden estimated the first two years of recommended thinning would yield about 400 mbf. "Mbf" is one thousand board feet of timber.

Meeting management goals will require an initial focus on the Lodgepole Pine and Grand Fir growing on the property around the meadow

edges. Most of this is on the south and east sides of the meadow. The Lodgepole Pine is at a mature age and dying. In a few spots it has fallen down adding to the wildfire hazard. There is over 300 mbf of lodgepole pine on the property according to the timber cruise and the inspecting forester recommends the merchantable ones be removed in the initial harvesting as well as cleaning up the dead and down trees already in place. In addition, the Grand Fir is clustered on the southwest edge of the meadow on the most productive soils on the property for forage or timber production. Grand Fir is a poor market performer long term and is also more susceptible to insects and disease than other species present on the site. Several individual Grand Fir trees showed defect and disease in the walk through. Because of this, the removal of the Grand Fir at the earliest market opportunity and its replacement with either seedlings of another species or forage is highly recommended. The selective removal of the Lodgepole Pine and Grand Fir as well as the removal of other species that are diseased or defective would generate approximately 400 mbf initially in the first two years and promote considerable reduction in the fire hazard potential and increased growth in forage and timber production.

CP at 402-03.

Robert Broden further wrote:

### Best Management Practices
Best Management practices would include the proper timing of harvests to avoid potential insect issues with the Pine IPS bark beetle. To avoid IPS, operation activities should occur after July 1 and cease prior to March 15 on any calendar year. This allows the slash created to dry out prior to the normal beetle flights in June. Harvest operations should occur during dry or frozen soil conditions to prevent soil compaction and subsequent loss of soil pore space.

CP at 407. Robert Broden also recommended, due to fluctuations in the local timber market, that a log purchase agreement be in place prior to any logging.

Against their wishes, the trial court awarded Roy and Rubye Ames a life estate.

As for timber, the trial court orally ruled:

9

I want to accord Mr. and Mrs. Ames here the ability to use their timber as long as it's not, again, wasteful, and it's something that - but, that is a - that is something that's common in this area. When people get older, they have that resource and they're able to use it. So, that's the timber and the logging.

RP (Sept. 12, 2012) at 1029-30. When Roy and Rubye's counsel requested greater clarity, the trial court asked counsel for suggestions.

Roy and Rubye Ames suggested that timber harvesting could be "in accordance with [Department of Natural Resources] rules and regulations," or conform to the Broden timber management plan already in evidence. RP (Sept. 12, 2012) at 1032. Stanley and Wesley Ames argued against the first option as allowing almost unlimited logging. The two older brothers agreed to the use of the Broden report on the condition that they could offer their own timber report.

The following colloquy occurred at the end of trial:

> THE COURT: And, the other suggestion here?
> MR. WEBSTER [Counsel for Stanley and Wesley Ames]: Well, the other suggestion, I believe, has some merit, but I don't believe that we should be - I think that we should be able to get an independent cruise [timber inventory] as well, because like minds made us agree on what can be harvested every year. I think that the one that Mr. Montgomery [Roy and Rubye Ames' counsel] has included, when I read it, it says that seven truckloads a year, or I think 320,000,000 board feet should be able to be taken out per year, and that the levels won't decrease with that much coming off. I don't know that . . .
> THE COURT: You want to get a second opinion.
> MR. WEBSTER: I think so, Your Honor.
> THE COURT: Sure.
> MR. WEBSTER: At the very least, if we go that way we should be able to get a second opinion. What we would propose is that a dollar

10

amount that can be taken in total from there would - would solve all disputes without having more costs.

THE COURT: Well, if we could get two opinions and then try to agree on a dollar amount, I think that would be a good solution, then we wouldn't have any room for argument, or . . .

MR. WEBSTER: I think that might be the best way to go, Your Honor, and if we got two opinions that say that the value of the timber land is not going to decrease with this type of management, I think that's where we're at to protect all the parties. Um, the other option we have as Chris gave to you, I would say that the traditional use has been $1500.00 a month - I mean, a year, over the 15 ½ years according to the testimony of Roy and Rubye. My clients are willing to double that and say that they could take up to $3,000.00 a year off for their own personal expenses. I think that's the simplest, the most cost effective, and it gives them double what they've traditionally used, and it doesn't cause any arguments. It's - it's a number.

THE COURT: Well, I - I think, you know, I don't know how much this is gonna cost to get, you know - the other, the Brogan [Broden] plan's already in, so to speak.

MR. MONTGOMERY: Yes.

THE COURT: So, we just need to get the other one and, you know, if it's not unduly expensive, in my mind that would be the better way to go. It would be sensible long-term, and if the property can be harvested, but not undermine the value, you know, unduly, I mean, I - and leave the title holders with, you know, some guarantee as to the resource, I think that's - that's the goal in my mind. But to maximize the amount that Roy and Rubye have available to them. So, I think that . . .

MR. WEBSTER: So, a second opinion, we'll organize that . . .

THE COURT: Yes.

MR. WEBSTER: . . . ascertain whether they're far off - I mean, in a perfect world, they're both gonna be right on, agreeing with each other, but we know that's probably not gonna happen, but - and then try to have a meeting of the minds?

THE COURT: Sure. That would be the best way to do it.

MR. WEBSTER: Um, if that fails, come back to court?

THE COURT: Yes.

MR. WEBSTER: Okay.

RP (Sept. 12, 2012) at 1034-35.

11

On November 15, 2012, Robert Broden supplemented his report by declaration. In that declaration, Broden estimated that, in 1997, the property contained about 1,006 mbf of standing timber. Based on a forestry technique termed "habitat typing," Broden estimated an annual average timber growth rate of 2.5 to 3 percent. CP at 326.

> Using the estimated volume of timber on the property in 1997 (1,006 mbf) and my estimate of growth of 2.5% (based on tree age and condition) means you should have been able to harvest 25.15 mbf annually since 1997 indefinitely, if done properly, and still maintained the 1,006 mbf of standing volume. 25 mbf equates to between 5 and 6 standard logging truck loads. The volume harvested by Roy and sent to Springdale Lumber would have been part of this 25 mbf. The fact that the harvest was well below this level is why at the time of the timber cruise in October of 2011 there was 1,471 mbf on the property. By today's date it would have grown to an estimated 1508 mbf.

CP at 326.

On November 15, 2012, Stanley and Wesley Ames filed, with the court, a timber report from forester Maurice Williamson. Williamson estimated the total timber stand at 1,523 mbf and an average annual timber growth of 1.4 percent. Williamson recommended:

> Based on the stand volume and property-specific growth rate actually determined, and a predicted annual mortality rate of 0.7%, the average annual timber harvest should be 10.7 MBF (thousand board feet) to maintain the timber stand at approximately its current volume. This harvest volume will correspond to approximately two to three truck loads depending on log size.
>
> The 10.7 MBF average annual harvest should concentrate initially on the short-lived lodgepole pine, followed by select harvest of grand fire [sic] and by removal of trees showing evidence of disease. Trees to be

12

removed should be marked at breast height and on the stump by a knowledgeable forester able to identify such diseased trees and other trees whose removal would significantly promote stand health. Subsequent harvest should be mixed age select harvest in order to maintain a healthy stand with substantially the same volume, wildlife values, and aesthetic character as currently exists.

CP at 297. Like Broden, Williamson recommended limiting logging to after August 1

and prior to March 1 to prevent insect infestations.

In his report, Maurice Williamson highlighted his agreements and disagreements

with Robert Broden:

I have reviewed two Stewardship Reports prepared by Bob Broden concerning the property. His inventory methodology and results appear appropriate and the stand volume he determined is within the margin of error of our volume determination.

**However, Mr. Broden assumed a 2.5% growth rate without determining the actual growth rate for the subject property and without accounting for natural mortality. As a result, the corresponding harvest level recommendation Mr. Broden provided are without factual support, are not applicable to this property, and should not be used for any purpose. Mr. Broden's suggested harvest levels, if followed, will result in substantial depletion of the stand volume and substantial change to the character of the forested areas of the property.**

In accordance with my recommendations above, I concur with Mr. Broden's suggestion that the short lived lodgepole pine and grand fir should be specified for removal prior to excessive mortality which, as I have previously discussed, may be imminent in the lodgepole pine component.

CP at 301 (emphasis in original.)

In a November 16, 2012 declaration, forester Williamson continued to note his

13

disagreement with habitat typing:

> Habitat type can provide a crude estimate of growth potential but can be misleading if not adjusted for environmental factors, stand structure, stocking level, and age. Habitat typing is not used to determine a specific annual growth rate. Growth rates decrease as trees get older and larger. Habitat typing provides no direct evidence of actual growth of trees in a particular time frame and location. As a result, Bob Broden's use of habitat type to lead to a timber harvest level recommendation is unreliable and provides incorrect results.
>
> The only method to determine actual growth is through sampling, typically including radial growth sampling, which we have done. We analyzed the growth rings in the outer 1 inch of more than 60 sample trees, and observed an average of approximately 20 rings in that outer 1 inch. Thus, on average, that one inch represents the growth over the last 20 years.
>
> The annual growth rate of 1.4% determined by our sampling and analysis is therefore an average over the approximately 20 years, not just the current growth rate.

CP at 341.

After reviewing Robert Broden's reports and Maurice Williamson's report and declaration, the trial court, on December 3, 2012, sent the parties a draft decree and completed findings of fact and conclusions of law. In addition to the facts recounted above, the court found:

> G. A number of equitable considerations work in favor of Wesley and Stanley and in favor of formal ratification of a life estate for Roy and Rubye, with legal title and a remainder estate to be vested in Wesley and Stanley. First, the oral life estate was to recognize and respect Roy and Rubye's right to remain in possession and control of the real property improvements, timber and farm operation until they die. Wesley and Stanley have consistently over the years acknowledged this goal. They have also respected the original oral agreement by keeping their payments

14

current. But it would ignore the remainder estate if now, after fifteen years, Roy and Rubye obtained title to the property which, given the present family alignment, they then would leave to Randy and Arleta.

H. Wesley and Stanley have agreed to pay $216,000 over thirty years, or sooner, if the life estate comes to an end. While they are not paying any interest on the declining balance due, the terms have not proved to be in their long-term financial interest. One value of the real property, improvements, timber and farm equipment was set in 1997 at $69,996, resulting in a remainder estate worth only $27,633. At a current value of approximately $350,000, the remainder estate is valued at $138,173; again substantially below the agreed purchase price.

I. A major consideration for Wesley and Stanley in purchasing the property was to provide for their retirements. They spent their youths on the farm, and now in later years, have plans to move back. Their return is also necessitated by financial considerations.

J. Over the years, Wesley and Stanley have made expenditures to help keep the farm up. Ames Development Corp. alone has expended a total of $31,205.06 to cover farm operating expenses of $13,959.71 and building/equipment expenses of $17,246.35.

. . . .

M. Roy A. Ames correctly understands that his life estate allows him to harvest timber on the property as he needs money and to properly manage, i.e., maximize the resource. Roy A. Ames has managed his timber for decades, and, "the good condition of the current timber stand on the ownership is a testament to Roy's (landowner) long term commitment to forest stewardship." . . . Roy A. Ames has been frugal with this resource, and now, in his and his wife's later years, they will have need for some increased harvesting.

CP at 419-21; *see also* CP at 1542.

The trial court ordered the property conveyed to Stanley and Wesley Ames, with an express life estate for Roy and Rubye Ames. The court concluded:

There shall be no limitations on the life estate, except – Wesley B. Ames and Stanley R. Ames shall be allowed to continue storage of cars on the property. . . . Roy A. Ames and Rubye M. Ames shall harvest timber in keeping with the Stand 1 Objectives at page 9 of the February 21, 2011

15

Plan [the Broden Report]; with any harvesting increases to be by Court order. The holders of the life estate and the remaindermen shall each be afforded the opportunity to present expert witness declarations.

CP at 422.

In the draft decree, the trial court allowed Roy and Rubye Ames to harvest up to "19 mbf, plus the salvage removal of identified 'at-risk' species." CP at 379. Robert Broden previously estimated that the selective removal of the lodgepole pine and grand fir and removal of other species that are diseased or defective would generate approximately 400 mbf in the first two years.

On December 14, 2012, Stanley and Wesley Ames objected to the timber award to Roy and Rubye Ames. The oldest sons argued that allowing a 400 mbf harvest under the guise of "salvage" is inconsistent with the historical practice and the idea of limited additional income. The brothers asked the court to order a maximum amount of logging at 20 mbf, inclusive of any salvage. In the alternative, the brothers asked the court to use WAC 222-16-010 to define "salvage," which defines the term as, "the removal of snags, down logs, windthrow, or dead and dying material."

On January 11, 2013, the trial court amended his ruling to allow Roy and Rubye Ames to harvest 19 mbf plus salvage as WAC 222-16-010 defines. In the amended ruling, "[a]ny annual logging proceeds beyond the 19 MBF and 'salvage' shall be shared in proportion to respective adjusted proportional values of the Life Estate and Remainder Interests based on the current Washington State DSHS Life Estate valuation table,

16

namely 70%, 30%." CP at 547. On January 29, 2013, the trial court clarified that 70 percent goes to Roy and Rubye Ames and the remaining 30 percent to their oldest sons. The trial court observed that Robert Broden's supervision "will, in the long run, protect the remainder estate." CP at 549.

In early 2013, Roy and Rubye Ames hired Jason Baker to prepare for logging, and Baker moved his equipment onto the Ames' farm in preparation for logging. On February 8, 2013, the trial court entered its decree, and summarized its rulings to date:

> [Roy and Rubye] are allowed to harvest timber on the property and manage said Timber Harvesting in accordance with the Timber Harvesting Report of Robert Broden of Brogue International dated November 1, 2012 (Exhibit "F"). SUBJECT TO timber harvest limitations as set-forth in the Timber Management Report and Goals of Robert Broden of Brogue International dated November 1, 2012, limited to an annual harvest of 19 mbf, plus salvage defined as the removal of snags, down logs, windthrown or dead or dying material, pursuant to WAC 222-16-010. Any annual logging proceeds beyond the 19 mbf and "salvage" shall be as per recommendations by Robert Broden, Forester, shared in proportion to respective adjusted proportional values of the Life Estate and Remainder Interests based on the current Washington State DSHS Life Estate valuation table, considered, but modified by discretion of the Court, namely 70% of the net proceeds after logging costs and taxes to Roy A. Ames and Rubye M. Ames, 30% of the net proceeds after logging costs and taxes to Wesley B. Ames and Stanley R. Ames. The adjustment balances the parents' full life estate interest, as against the continuing antagonism between their siblings which affects timber management. Any additional Timber Harvesting beyond that recommended by Robert Broden, Forester, shall be pursuant to further Order of this Court.

CP at 556-57. The court vested broad discretion in Robert Broden.

On February 13, 2013, Roy and Rubye Ames entered into a log purchasing

17

agreement with Vaagen Brothers Lumber, with Jason Baker delivering the timber to Vaagen Brothers. On February 15, 2013, Stan and Wes Ames moved to stay enforcement of the decree.

On February 19, 2013, Stanley and Wesley Ames moved for reconsideration, again asking the court to impose a maximum cap on logging. At a February 19 hearing, the trial court stayed logging on the property pending the outcome of the sons' motion for reconsideration, but ordered Stan and Wes to post a $10,000 bond within five days. On February 25, the brothers posted the $10,000 bond.

On March 1, 2013, Roy and Rubye Ames moved the court to amend the logging stay to allow them to harvest 19 mbf during the pendency of their sons' motion for reconsideration. Roy and Rubye argued that the delay caused by their sons' motion for reconsideration was unreasonable, given their advanced age and their need for money to complete the addition to their house. In the alternative, Roy and Rubye asked the court to increase the bond to $100,000 to cover the harvest of approximately 500 mbf of the total volume on the property of 1,508 mbf. The Broden Report estimated a 1997 volume of timber of 1,000 mbf. Thus, between 1997 and 2013, timber volume increased about 500 mbf. The couple characterized this increase as retirement savings, which, in their advanced years, they now sought.

Before considering Stanley and Wesley Ames' motion for reconsideration, the trial court granted, in part, Roy and Rubye Ames' two March 1 motions. On March 4,

18

2013, the trial court authorized the immediate harvest of timber up to 19 mbf.

On March 12, 2013, the trial court held a hearing for Stanley and Wesley Ames'

motion for reconsideration. The court conceded that the Broden Report was not

admissible under the hearsay exception for business records. The court noted that the

doctrine of waste, as embodied in Broden's and Williamson's reports, protects

remaindermen Stanley and Wesley from "unlimited logging," and that the two brothers

agreed to resolve the issue through post-trial declarations. As the brothers had since

submitted the Williamson Report, the court allowed Roy and Rubye Ames to similarly

resubmit Broden's report. The trial court observed that both Broden and Williamson

agreed that an immediate harvest of lodgepole and grand fir was needed to improve the

stands overall health, noting:

> Broden, I believe it is, talks about then 400 MBF over the first two years . . . of harvesting the lodgepole and the grand fir, if I've got this straight. So, that would be over and above the 19 MBF. This would be - and that's – that's a substantial . . . logging here that's a concern to the defendants, but I can see where it would be. But, on the other hand, the evidence that I have in front of me is that that's the prudent thing to do. That Williamson and Broden say that that particular species is in bad shape. So, it would be foolish to just let it die off, it would seem to me, as opposed to harvest it and share in some manner the proceeds from that recognizing that both the . . . plaintiffs and the defendants have an interest in this resource.
>
> . . . .
>
> [S]o those equitable considerations lead me to the conclusion here that there has to be this logging in keeping with the avoidance of waste, in keeping with proper resource management, and, uh, the formula should be 60% to the plaintiffs and 40% to the defendants, and - and I do that mostly on these equitable grounds. I do that because the experts tell me when I

19

read these reports that everybody agreed we should look at, uh, that there's this problem with diseased and dying trees and also a need for some thinning, and so, uh, that's where I come down. It would be the 19 MBF plus that amount of extra logging.

CP at 1315-17. The trial court affirmed its allowance of Roy and Rubye Ames to harvest 19 mbf plus salvage, plus an initial thinning to increase the overall health and growth of the forest, which, as noted in the Broden Report, might be as much as 400 mbf. The next day, on March 13, 2013, Roy and Rubye Ames filed an affidavit from Robert Broden to authenticate and submit his timber management report.

About March 20, 2013, Stanley Ames spoke with Steve DeLong from Vaagen Brothers Lumber about the log purchase agreement with Roy and Rubye. As the trial court later found:

> 1.11 Defendant, Stanley R. Ames, contacted Vaagen Brothers Lumber on or about March 20, 2013 and spoke to Steve DeLong about the Log Purchase Agreement. After that conversation, Steve DeLong, on behalf of Vaagen Brothers Lumber contacted Jason Baker d/b/a Mad Loggers and informed him that Vaagen Brothers Lumber would not be purchasing the timber on the Ames Farm until the legal issues were resolved;
> 1.12 Whether it was the intent of the Defendant, Stanley R. Ames, to interfere with the Log Purchase Agreement or not, his having contacted Vaagens had the effect of causing Vaagens to cancel the Log Purchase Agreement with the Plaintiffs, Roy and Rubye Ames;
> 1.13 After Steve DeLong of Vaagen Brothers Lumber contacted Jason Baker d/b/a Mad Loggers and informed him that they had cancelled the Log Purchase Agreement with Plaintiffs, Roy and Rubye Ames, Jason Baker d/b/a Mad Loggers moved his equipment off the Ames property and sent them an Invoice for $16,460.00 since was unable to perform under the contract;

20

CP at 1745. On March 25, 2013, Jason Baker wrote Roy and Rubye Ames to inform them that he suffered damages as a result of the Vaagen Brothers' cancellation of the log purchase agreement.

On April 1, 2013, Roy and Rubye Ames moved the trial court to order the $10,000 bond forfeited, pointing to Stan Ames communications with Jason Baker.

On April 11, 2013, the trial court entered an order granting Stanley and Wesley Ames' motion for reconsideration in part. The court increased Stan and Wes' share of net proceeds from logging over 19 mbf from 30 percent to 40 percent. Otherwise, the trial court denied the motion for reconsideration.

On May 10, 2013, Stanley and Wesley Ames moved the court to continue the stay of timber harvest during the appeal, replace the cash bond with a lien against their remainder interest in the property, and to order the return of the $10,000 cash bond already posted. On May 14, 2013, the trial court set bond for Stanley and Wesley's appeal at $55,000. The court deferred ruling on whether to forfeit the $10,000 bond already posted.

Also on May 14, 2013, the trial court struck the Broden Report from its December 4, 2012 findings and conclusions, and replaced it with the same report, but from Broden's March 20, 2013, declaration. On May 15, 2013, the trial court ruled that Roy and Rubye may transport and sell some timber cut between April 22, 2013 and May 10, 2013, with the proceeds to be disbursed consistent with the parties' share ordered by the court. A

21

May 15 order stayed all additional logging pending the outcome of Stanley and Wesley's appeal to this court and based on the $55,000 supersedeas bond.

On June 10, 2013, Roy and Rubye Ames filed a motion to forfeit the original $10,000 bond. In a declaration, the parents stated:

> The preparation work we had Jason Baker do, and the timing of his preparation work, were both authorized and reasonable. The fact that Jason Baker moved his equipment and performed the preparation work without being able to haul any logs to the mill so he could get paid was directly and solely the result of the Defendants' Request for Reconsideration, not from any improper action on our part. Therefore, we should not have to bear any part of the damages that resulted from the stay the Defendants obtained during their Request for Reconsideration.

CP at 1723-24. On June 14, 2013, the trial court granted Roy and Rubye's motion to forfeit the $10,000 bond in part, writing:

> The Court finds that the Plaintiffs and the Defendants should be held equally responsible for expenses related to the suspension of logging operations in March 2013: Specifically, the unpaid Invoice of Jason Baker d/b/a Mad Loggers in the amount of $16,460.00 admitted during the hearing as Plaintiffs' Exhibit No. "1". Plaintiffs shall be responsible for $8,230.00 and the Defendants shall be responsible for $8,230.00 of said Invoice.

CP at 1745. The trial court directed the court clerk to tender the sum of $8,230, from the $10,000 bond, for disbursement to Jason Baker. The remaining balance in the amount of $1,770.00 was to be returned to Stanley Ames.

22

## LAW AND ANALYSIS

Stanley and Wesley Ames contend: (1) the trial court relied on inadmissible evidence, the Broden Report, when it concluded that timber harvesting consistent with the report is not waste; (2) the trial court's timber award constituted an abuse of its discretion in equity; (3) the trial court's timber award is inconsistent with the general rule that life tenants commit waste when they remove substantial amounts of timber; and (4) the trial court abused its discretion when it ordered the partial forfeiture of the $10,000 bond.

### Broden Report

Wesley and Stanley Ames assign error to the admission of the Broden Report as a business record at trial. Nevertheless, the trial court did not resolve what timber rights to grant Roy and Rubye Ames at trial. At trial, neither party presented sufficient evidence on the issue. At the parties' suggestion, the trial court resolved the timber dispute through posttrial declarations. In turn, the trial court struck the Broden Report from the trial record and relied on a version of the report submitted posttrial by declaration.

The brothers Ames agreed to the procedure of submitting forester reports by declaration post-trial. In fact, they first suggested the procedure. They participated in this procedure by submitting Maurice Williamson's report. They complained of the court's declaration procedure only after the court ruled in favor of Roy and Rubye.

We estop Stan and Wes Ames from objecting to the declaration procedure that

23

they suggested. *Ashmore v. Estate of Duff*, 165 Wn.2d 948, 951, 205 P.3d 111 (2009). If the trial court committed any error, Wesley and Stanley Ames encouraged the error. Under the doctrine of invited error, a party may not materially contribute to an erroneous application of law at trial and then complain of it on appeal. *In re Dependency of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995).

Timber Rights

Before this litigation, title to the Stevens County property rested in Stanley and Wesley Ames and no written instrument reserved a life estate in the land for Roy and Rubye Ames. The trial court therefore employed a constructive trust to impose the life estate upon title to the property. Stanley and Wesley Ames asked the trial court to grant Roy and Rubye Ames a life estate and do not assign error to the imposition of the constructive trust. Instead they contend the trial court abused its discretion, when granting the life estate, because it (1) improperly considered Roy and Rubye's financial need, and (2) allowed Roy and Rubye Ames to presently sell salvage timber instead of setting a maximum limit on logging. "We review the authority of a trial court to fashion equitable remedies under the abuse of discretion standard." *Sac Downtown Ltd. P'ship v. Kahn*, 123 Wn.2d 197, 204, 867 P.2d 605 (1994).

In their briefing, Stanley and Wesley Ames characterize the trial court's award as allowing "unrestricted and massive logging," "virtually unlimited" logging, and logging off "half the forest." Br. of Appellants at 33, 35, 42. The brothers exaggerate. The court

24

permitted Roy and Rubye Ames to harvest up to 19 mbf, plus salvage as WAC 222-16-010 defines, plus thinning as recommended by Robert Broden to promote the timber stand's overall health and growth. The net proceeds from any harvesting beyond 19 mbf and salvage go 60 percent to Roy and Rubye Ames and 40 percent to Stan and Wes Ames. For the first two years, this additional thinning might be significant, up to 400 mbf, given the current condition of the lodgepole, grand fir, and other timber.

Stanley and Wesley Ames argue briefly that the trial court improperly considered Roy and Rubye's financial need in fashioning its remedy. The brothers do not indicate how this consideration harmed them, but perhaps they claim that this consideration led the trial court to grant excessive logging rights. The brothers Ames, when raising this assignment of error as an isolated assignment, fail to support the argument with citations to legal authority and references to relevant parts of the record. Thus, we refuse to hear the assignment under RAP 10.3(a)(6). "Unsubstantiated assignments of error are deemed abandoned." *Kittitas County v. Kittitas County Conservation Coal.*, 176 Wn. App. 38, 54, 308 P.3d 745 (2013).

Regardless, this argument is without merit. The impetus for the 1997 agreement transferring the property to Stanley and Wesley Ames was to provide for Roy and Rubye Ames' financial security. Stanley and Wesley paid above market value for their remainder interest, based on their ability and willingness to help their parents. Sitting in equity, the trial court sought to give effect to the parties' original intent. Roy and

25

Rubye's continued financial security was a paramount concern. Courts may impose a constructive trust to give effect to the parties' intent. *Baker v. Leonard*, 120 Wn.2d 538, 548, 843 P.2d 1050 (1993). "When the equitable jurisdiction of the court is invoked by the parties, whatever relief the facts warrant will be granted." *Kreger v. Hall*, 70 Wn.2d 1002, 1008, 425 P.2d 638 (1967).

Clear, cogent, and convincing evidence must support "the basis for impressing the trust." *Baker*, 120 Wn.2d at 547. "Evidence is clear, cogent, and convincing if it shows that the ultimate fact in issue is highly probable." *Dave Johnson Ins. Inc. v. Wright*, 167 Wn. App. 758, 774, 275 P.3d 339, *review denied*, 175 Wn.2d 1008 (2012). Assuming this evidentiary burden applies to the conditions of the trust, not only the creation of the trust, overwhelming evidence supports the trial court's conclusion that the purpose of the transfer to the sons and retention of the life estate was for the purpose of the financial needs of Roy and Rubye Ames.

Stanley and Wesley Ames next argue that the trial court committed error when allowing Roy and Rubye Ames to engage in salvage logging. Stan and Wes write: "Predictably, Randy abused the discretion the court gave Roy and Rubye under the Broden report and logged off a 486 [mbf] of timber as soon as he could rationalize it to himself that he was not violating a court order." Br. of Appellants at 37. The older brothers argue that the court should have foreseen and prevented this abuse by setting a precise lid on logging.

26

The trial court noted that a numerical limit would have prevented Roy and Rubye Ames from effectively managing the forest. The court found that the life estate was intended to allow Roy Ames to harvest timber on the land to the extent he and his wife needed the proceeds. Roy Ames had been frugal in the past decades and the couple had need for increased harvesting. The sons do not challenge these findings.

Roy and Rubye Ames allowed the timber to grow beyond its 1997 volume of about 1,000 mbf to over 1,500 mbf. Both Robert Broden and Maurice Williamson agreed that the forest demanded thinning for health and growth, and Broden estimated the need for 400 mbf in thinning over the first two years. The trial court astutely observed: "So, it would be foolish to just let it die off, it would seem to me, as opposed to harvest it and share in some manner the proceeds from that recognizing that both the . . . plaintiffs and the defendants have an interest in this resource." CP at 1315.

Stanley and Wesley Ames next contend the trial court's timber award disrupts the general rule that life tenants commit waste when they remove substantial amounts of timber. Along these lines, the sons argue that there is no evidence that they and their parents intended something other than the general rule for life tenants.

Stanley and Wesley Ames ignore Roy and Rubye Ames' testimony that they intended to exercise full control and dominion over the land until they died, without the normal duties or restrictions of a life estate. Stan and Wes admitted themselves that this is not a typical life estate, noting: "The Court has already mandated significant deviations

27

from a standard life estate, such as requiring the Defendants to pay property taxes,

allowing storage and exchange of cars, and allowing an annual visit." CP at 428.

Regardless, the trial court's timber award did not deviate from the general rule for

life tenants and timber.

> The general rule that a life tenant impeachable for waste may not cut timber for commercial purposes is subject to a well-established exception, under which a life tenant may cut and sell timber. This exception has been established principally by modern authorities in favor of the owners of timber estates, that is, estates which are cultivated merely for the produce of salable timber and in which the timber is cut periodically. The reason for the distinction is, that since cutting the timber is the mode of cultivation, the timber is not to be kept as part of the inheritance, but part, so to say, of the annual fruits of the land; in these cases, the same kind of cultivation may be carried on by the tenant for life that has been carried on by the settlor on the estate, and the timber so cut down periodically in due course is looked upon as the annual profits of the estate and therefore goes to the tenant for life.

M.C. Dransfield, Annotation, *Timber Right of Life Tenant*, 51 A.L.R.2d 1374, 1375-76

(1957). Thus, the general rule in the United States is:

> The tenant for life is permitted to cut timber for the purpose of clearing the land, provided the part cleared, with that already prepared for cultivation, as compared to the remainder of the tract, does not exceed the proportion of cleared to wooded land usually maintained in good husbandry; and provided further, that he does not materially lessen the value of the inheritance.

Dransfield, supra, at 1382.

The Broden Report indicated that Roy and Rubye Ames allowed the timber to

grow to over 1,500 mbf. Whether that timber was harvested and sold, or saved for later

28

harvesting within the forest itself, that 500 mbf of accumulated "annual profits" belongs to Roy and Rubye under the general rule of life estates.

Case law also supports the trial court's direction to sell salvage lumber and to thin the forest. *Wigal v. Hensley*, 214 Ark. 409, 216 S.W.2d 792 (1949) stands for the proposition that the court has the power and authority to order the sale of standing timber to prevent waste. Stan and Wes Ames argue that *Wigal* addressed only a jurisdictional issue where all parties agreed that logging would be beneficial. *Wigal* did not. The brothers argue, whether a court could authorize the sale of timber to prevent waste when the parties disagree about the utility of logging. But in *Wigal*, the appellant only challenged jurisdiction as a means of preventing the sale of timber. In *Wigal*, the court noted:

> [T]he timber involved should be cut and removed to prevent waste and to protect the interest of both the life tenant and remaindermen. The testimony of an expert forester who cruised the timber is that the pine timber had fully matured, would not advance further in height or diameter and should be removed in order to permit a new crop to mature; that 90 per cent of the hardwood timber had matured and was rapidly deteriorating in merchantableness because of damage by moisture and bugs; that all the timber was subject to the hazards of fire and windstorm; and that it was following the practice of good forestry husbandry to cut and remove the timber as provided in the sale agreement.

*Wigal*, 214 Ark. at 411.

Under *Kruger v. Horton*, 106 Wn.2d 738, 743, 725 P.2d 417 (1986), the removal of timber constitutes waste only if it decreases the value of land. Under *Pedro v.*

29

*January*, 261 Or. 582, 598, 494 P.2d 868 (1972), "a life tenant may, under certain circumstances, thin trees to promote growth." 261 Or. at 595. These persuasive authorities further show that the trial court's timber award does not propagate waste.

Partial Forfeiture of Supersedeas Bond

Stan and Wes Ames contend the trial court erred when it ordered the partial forfeiture of the $10,000 bond.

The parties refer to the $10,000 bond as a supersedeas bond and they cite cases concerning RAP 8.1. RAP 8.1 addresses a stay of judgment or decree through appeal. Here, the trial court stayed enforcement of its decree pending the outcome of Stanley and Wesley Ames' motion for reconsideration under CR 59. Since the stay concerned a pending motion before the trial court, and not the current appeal, CR 62 applies. *Boeing Co. v. Sierracin Corp.*, 43 Wn. App. 288, 291, 716 P.2d 956 (1986).

In relevant portion, CR 62 provides:

> (b) **Stay on Motion for New Trial or for Judgment.** *In its discretion and on such conditions for the security of the adverse party as are proper*, the court may stay the execution of or any proceedings to enforce a judgment pending the disposition of a motion for a new trial or to alter or amend a judgment made pursuant to rule 59.

(Emphasis added.)

The question on appeal is not whether the trial court had authority to require the posting of the $10,000 bond, but whether the trial court held authority to order forfeiture of the bond to the extent of $8,230. Cr 62 does not mention the conditions under which

the trial court may forfeit all or a portion of the bond posted pending resolution of a motion for reconsideration. We find no cases that address the forfeiture of a bond posted pursuant to CR 62, so we rely on cases involving a supersedeas bond. One purpose of the bond on appeal is to enable the judgment creditor to be able to enforce the judgment after appeal. But our Supreme Court, in another setting, noted that, under RAP 8.1(b)(2), a party who supersedes enforcement of a trial court decision affecting property during an unsuccessful appeal is liable to the prevailing party for damages resulting from the delay in enforcement. *Norco Constr., Inc. v. King County*, 106 Wn.2d 290, 296, 721 P.2d 511 (1986). By analogy, the prevailing party should be free to use a bond posted pursuant to CR 62 to recover damages from the delay in enforcement of the trial court order.

The trial court ordered Stanley and Wesley Ames to post a $10,000 bond in order to stay their parents' property rights to harvest timber. Thus, Roy and Rubye Ames should be free to use the bond for damages resulting from the delay in their right to harvest.

Roy and Rubye Ames entered a log purchase agreement with Vaagen Brothers Lumber to purchase the timber, and contracted Jason Baker to harvest it. The trial court found that learning of the ongoing litigation caused Vaagen Brothers Lumber to cancel the log purchasing agreement, thus causing the parents to breach their agreement with Baker. But for the sons' motion for reconsideration, the parents would have successfully contracted Jason Baker to harvest timber. The delay in enforcement caused Roy and

31

Rubye Ames' damages. The trial court might have forfeited the entire bond to pay for the $16,460 in damages incurred, but only forfeited half the amount.

Stanley and Wesley Ames argue and their parents concede that the standard of review in the question of the forfeiture of the bond is unclear. The brothers ask this court to review the lower court's findings for substantial evidence, and its conclusions de novo. The parents ask this court to review the lower court's forfeiture of the bond for an abuse of discretion. We find no reason to resolve this dispute. Even if we addressed the issue anew, we would affirm the trial court.

Stanley and Wesley Ames attempt to construe the court's forfeiture of the bond as holding them liable for tortious interference with a contract. In turn, they argue that their parents did not establish all elements of the tort. While the tort might describe the sons' actions, the trial court did not order $8,230 dollars forfeited on that ground. If grounds exist under bond law to forfeit the bond, the applicability or lack of applicability of a tort is irrelevant to the forfeiture. The sons cite no law requiring courts to conduct a case within a case prior to forfeiting a bond.

### Attorney Fees

Roy and Rubye Ames ask this court to award them attorney fees and costs on appeal on equitable grounds. RAP 18.9 provides:

> The appellate court on its own initiative or on motion of a party may order a party . . . , who uses these rules for the purpose of delay, [or] files a frivolous appeal . . . to pay terms or compensatory damages to any other

party who has been harmed by the . . . failure to comply.

Instead of arguing that their sons filed a frivolous appeal, Roy and Rubye Ames assert bad faith. The parents emphasize the sons' removal of farm equipment and Stan's phoning Vaagen Brothers Lumber to inform them of the ongoing litigation. Roy and Rubye allege that their sons are trying to drain their financial resources through a litany of meritless motions and this appeal. "Bad faith" on its own is not a ground for an award of attorney fees on appeal. We must address whether the appeal is frivolous.

An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ and that it is so devoid of merit that there is no possibility of reversal. *Lutz Tile, Inc. v. Krech*, 136 Wn. App. 899, 906, 151 P.3d 219 (2007). We resolve all doubts to whether an appeal is frivolous in favor of the appellant. *Lutz Tile*, 136 Wn. App. at 906. In light of the factual complexity of the background of the suit and the paucity of Washington law on timber rights and life estates, we do not conclude the appeal to be devoid of merit.

Stanley and Wesley Ames posted another bond to supersede the judgment while the case is on appeal. Roy and Rubye Ames also ask this court to order the forfeiture of this actual supersedeas bond. Following this court's disposition of the appeal, Roy and Rubye may raise that issue with the lower court.

33

## CONCLUSIONS

We affirm the trial court and deny Roy and Rubye Ames' request for attorney

fees.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

34